WILFREDO MARIBONA,

   **Plaintiff,**      CASE NO. 2:22-cv-00244-JES-NPM

**vs.**

**WAL-MART STORES EAST, LP,**

   **Defendant.**

_____ /

## PLAINTIFF'S *DAUBERT* MOTION TO PRECLUDE EXPERT

## TESTIMONY OF DERREK-IAN VERLAAN

  Plaintiff, WILFREDO MARIBONA, moves this Court to preclude or limit the testimony of the Defendant's expert, Derrek-Ian Verlaan, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 526 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. at 152 (1999); and rules 702, 401, 402, and 403 of the Federal Rules of Evidence. Defendant respectfully requests a *Daubert* hearing to determine the admissibility of Mr. Verlaan's testimony.

### Factual Background

  This case arises out of a slip and fall in the parking lot of the Defendant's store in Collier County, Florida on January 21, 2021. The Plaintiff alleges that he slipped due to the painted stop bar being slippery when wet as the result of rain. The incident

was captured on store surveillance which confirms the Plaintiff's version of events. The Plaintiff has retained an expert, Christopher Zimmerman, State Licensed Building Inspector, who has opined in his report and deposition that the paint on the stop bar did not have appropriate slip resistance and that the Defendant violated numerous building and other codes.

The Defendant hired Derrek-Ian Verlaan ("Verlaan"), Certified Safety Professional, for the purpose of being a rebuttal expert to Mr. Zimmerman. See deposition of Verlaan, attached hereto as Exhibit "A", p.14, lines 20-22. Verlaan never went to the scene (Verlaan depo p.16, lines 1-2), was unable to determine why the Plaintiff slipped (Verlaan depo p.17, lines 1-3), and does not have an opinion on whether or not the Plaintiff was negligent (Verlaan depo p.17, lines 7-10). The primary finding of Verlaan is that the stop bar was not slippery based solely on looking at the video to see if anyone else slipped and then doing a statistical analysis, which constituted the totality of his investigation. Verlaan depo p.28 line 24 – p.29 line 16. The statistical analysis was based on the alleged "fact" that no one else had slipped in the past six months; however, Verlaan conceded that he did not know how many, if any, had actually slipped. Verlaan depo p.52, lines 19-23. His statistics encompass six months; however, he did not take weathering into account, and he conceded that he did not know how long the condition had existed. Verlaan depo p.52, line 25 – p.53, line 15. Verlaan also stated that he does not have a degree in statistics. Verlaan depo p.57, lines 12-13.

## Summary of Argument

The Defendant bears the burden of establishing the reliability of Verlaan's testimony. His opinions regarding the slipperiness, or lack thereof, of the painted stop bar do not require any expert training or expertise, but primarily consists of watching a video to see if anyone else slipped. He then expands that out to an arbitrary period of time based on insufficient data such as not knowing if anyone else slipped or if the condition of the surface changed over time. Verlaan fails to use established scientific principles and analysis to come up with his findings.

## Argument and Authorities

Under Rule 702 of the Federal Rules of Evidence, "expert testimony must be both reliable and relevant." *Umana-Fowler v. NCL (Bah.) Ltd.*, 49 F. Supp. 3d 1120, 1121 (S.D. Fla. 2014) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)). The party offering the evidence has the burden to show that: 1) the expert is qualified due to having knowledge, skill, experience, training or education in the field of said testimony; 2) such testimony will assist the trier of fact to understand evidence or determine a fact in issue; 3) the testimony is based on sufficient facts or data; 4) the testimony is the product of reliable principles and methods; and, 5) the witness reliably applies the principles and methods to the facts of the case. FED. R. EVID. 702; FED.R. EVID. 104(a); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993).

This Court's "gatekeeping" responsibility under *Daubert* cannot be overstated. *Frazier*, 387 F.3d at 1260. As the Supreme Court framed it in *Kumho Tire*, "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. at 152 (1999). The question of whether an expert's testimony is reliable depends on the facts and circumstances of the particular case. *Id.* at 158. The party offering the expert testimony bears the burden of establishing reliability and helpfulness. *Frazier*, 387 F.3d at 1260.

An expert opinion should be excluded if it's not "helpful" to the jury. An opinion is not helpful to the jury if the average layperson is "capable of understanding an issue without the aid of an expert." *United States v. Navedo-Ramirez*, 781 F.3d 563, 568 (1st Cir. 2015) (citing *United States v. Salimonu*, 182 F.3d 63, 74 (1st Cir. 1999)) (affirming district court's exclusion of expert testimony regarding battered woman syndrome and duress in part because threats defendant received were such that that "any person could readily appreciate their impact" unaided by expert testimony). "Because of the powerful and potentially misleading effect of expert evidence, . . .sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403." *Frazier*, 387 F.3d at 1263. "The judge in weighing possible prejudice

against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Id.* (internal quotation omitted); *see also United States v. Stevens*, 935 F.2d 1380, 1399 (3d Cir. 1991).

I. **This Court should exclude Verlaan's expert testimony under Rule 702, because the Defendant has not established that his methodology or experience is reliable to establish his particular opinions.**

"The reliability standard is established by Rule 702's requirement that an expert's testimony pertain to 'scientific . . . knowledge,' since the adjective 'scientific' implies a grounding in science's methods and procedures, while the word 'knowledge' connotes a body of known facts or of ideas inferred from such facts or accepted as true on good grounds." *Daubert*, 509 U.S. at 580. This entails an assessment of whether the "methodology underlying the testimony is scientifically valid." *Id*. at 592. The four non-exhaustive factors used to evaluate the reliability of a scientific expert opinion include the following: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. *United States v Frazier* 387 F.3d 1244 (11th Cir. 2004).

Verlaan failed to visit the scene, failed to do any testing or take any measurements, but solely based his opinion on watching the store video and counting the number of people who did not slip. In doing so, he based his opinion on no one else slipping, when in fact, he was unable to know that number, and failed to take

into account whether or not the condition changed over time. His opinion, formulated in the manner he does, fails all 4 prongs of the standard laid out in *Frazier*, above.

## II. This Court should exclude Verlaan's expert testimony under Rule 702, because the Defendant has not established that his opinion will assist the trier of fact

"[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person" and offers something "more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63. Rule 702(a) permits expert testimony if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact at issue.

In the instant case, Verlaan simply deduces that the painted area was safe based upon watching a video of other people crossing the area, and then multiplies it out to an arbitrary date. That is something that any layperson could accomplish without any expertise. Additionally, the parameters that Verlaan uses are totally arbitrary: picking six months, estimating the number of rainy days, the number of pedestrians each day, failing to take into account deterioration of the paint over time, and the fact that different portions of the stop bar would deteriorate differently given contaminants, traffic, and what different footwear was being worn. Depo of Verlaan, p.12, lines 12-17.

Verlaan's "expert" testimony amounts to: Nobody else fell so it's safe. This is clearly non-scientific, and should be left to the argument of counsel. And if, arguendo, that was the standard, then any layperson would be able to jump to the same conclusion.

In sum, Verlaan's testimony is of limited probative value with regards to determining whether the painted stripe was unduly slippery, has the potential to confuse the jury, and is prejudicial to the Plaintiff. It is inadmissible under Rule 702, 401, 402, 403 to establish whether or not the stop bar was in a negligent and unsafe condition.

For the reasons set forth above, the Plaintiff seeks a hearing pursuant to Daubert on the admissibility of Verlaan's testimony and prays that this Court preclude or otherwise limit the testimony of Verlaan.

## Local Rule 3.01(g) Certification

The undersigned certifies that he has conferred with opposing counsel on September 25, 2023, via telephone, and that opposing counsel opposes the motion.

/s/ **Malcolm A. Purow**
Malcolm A. Purow
Attorney for Plaintiff
FBN 282790
Kelleher Law, P.A.
1100 Fifth Ave. S., Ste. 408
Naples, FL 34102
mpurow@jimforjustice.com
954-295-6661

## CERTIFICATE OF SERVICE

On September 26, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all attorneys of record.

/s/ **Malcolm A. Purow**
Malcolm A. Purow
Attorney for Plaintiff
FBN 282790
Kelleher Law, P.A.
1100 Fifth Ave. S., Ste. 408
Naples, FL 34102
mpurow@jimforjustice.com
954-295-6661

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

WILFREDO MARIBONA,

    Plaintiff,

VS.               2:22-cv-00244-JES-NPM

WAL-MART STORES EAST, LP,

    Defendant.

_____/

REMOTE
DEPOSITION OF:  Derrek-Ian G. Verlaan

DATE:        August 22, 2023

TIME:        10:00 a.m. to 1:13 p.m.

PLACE:       All parties present via
            remote video conference

REPORTED BY:    Sharon Dutton, Registered
            Professional Reporter and
            Notary Public, State of Florida

**EXHIBIT "A"**

1        R E M O T E   A P P E A R A N C E S

2

3  MALCOLM A. PUROW, ESQUIRE
   OF:  KELLEHER LAW, P.A.
4       1100 Fifth Avenue South, Suite 408
        Naples, Florida  34102
5       mpurow@jimforjustice.com

6       on behalf of the plaintiff

7

8  BARTHOLOMEW COZAD, ESQUIRE
   OF:  DERREVERE, HAWKS, BLACK & COZAD
9       2005 Vista Parkway, Suite 210
        West Palm Beach, Florida  33411
10      bcozad@derreverelaw.com

11      on behalf of the defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I N D E X

2 TESTIMONY OF DERREK-IAN G. VERLAAN:

3    Direct Examination by Mr. Purow...............4

4    Cross-Examination by Mr. Cozad...............66

5    Redirect Examination by Mr. Purow............67

6 CERTIFICATE OF OATH..............................69

7 CERTIFICATE OF REPORTER..........................70

8 ERRATA SHEET.....................................71

9 NOTIFICATION LETTER..............................72

10         E X H I B I T S

11        (no exhibits marked)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE COURT REPORTER:  Do you solemnly swear or

3     affirm the testimony you give will be the truth,

4     the whole truth, and nothing but the truth?

5          THE WITNESS:  Yes, I do.

6               DEREK-IAN G. VERLAAN,

7     having been duly sworn, was examined and testified as

8     follows:

9                    DIRECT EXAMINATION

10    BY MR. PUROW:

11         Q   Good morning, sir.  Would you tell us your

12    name, please?

13         A   Sure.  My name is Derek G. Verlaan.

14         Q   And, sir, what is your primary area of

15    expertise?

16         A   My primary -- I'm basically -- I'm a -- I do

17    safety consulting.  I also do property loss consulting

18    with respect to insurance -- insurance claims, like for

19    hurricane damage, that type of thing.  Also do some

20    fire investigation and environmental consultant.

21         Q   But is safety consulting your primary area

22    that you focus on?

23         A   It's one of the areas that I -- it's one of

24    the areas that I work in.

25         Q   Okay.  So I'm looking at your CV --

1    A   Yes, sir.

2    Q   -- and the CV seems to focus on construction

3  consulting and property loss, mold issues, structural

4  fire and water damage, drywall; would that be your

5  primary area of interest?

6    A   Well, in the center of the introduction it

7  says safety consulting and managing safety projects

8  related to premises liability, slip, trip and fall,

9  occupational safety analysis and research.

10   Q   Okay.  But that's --

11   A   The safety consulting and accident

12  investigation is the second line item under there.

13  It's a specialization.

14   Q   Okay.  What percentage of your employment

15  involves safety consulting and accident investigation?

16   A   Probably varies from year to year.  We've had

17  an inordinate amount of hurricanes, so I've probably

18  spent a lot of time more recently on doing that, but on

19  average I would say around 30 percent to 50 percent.

20   Q   Okay.  Now, you've given depositions before,

21  correct?

22   A   Yes, sir.

23   Q   Now, I was provided with a document entitled

24  DGV -- I assume that's you --

25   A   That's my initials, yes, sir.

1    Q   -- Rule 26 and it shows six depositions that

2   you've given since 2015; is that accurate?

3    A   That is accurate.

4    Q   Have you ever testified in court?

5    A   I have not.

6    Q   Have you ever had your testimony disqualified

7   in any court?

8    A   I have not.

9    Q   Okay.  Working from the bottom, I have you

10   testifying at a public hearing Fort Myers City Council

11   in 2015; what was that in relation to?

12    A   We represented a property owner who was doing

13   a development project and it was testimony in regards

14   to the environmental condition of the site that he

15   intended to redevelop.

16    Q   Okay.  And then you gave a deposition that

17   year in the case of Eddy versus Waldorf Astoria Naples?

18    A   That is correct.

19    Q   What kind of case was that?

20    A   That is a -- my recollection that was a slip

21   or a stumble on stairs.

22    Q   Okay.  And which party did you represent?

23    A   We represented Waldorf Astoria Naples.

24    Q   Okay.  The defendants in that case?

25    A   The defendant, yes, sir.

1    Q   And then in 2018 you gave a deposition in

2   Pando versus American Integrity Insurance?  That's

3   P-a-n-d-o.

4    A   Yes.

5    Q   What kind of case was that?

6    A   That case was a property loss case between a

7   homeowner and the insurance company, American

8   Integrity, that went into litigation over the loss and

9   I represented the property owner in that loss.

10    Q   Okay.  And then in 2019, Estate of Brandon

11   Kemp versus Royal Palm Marina; what kind of case was

12   that?

13    A   That was a case of a gentleman who was an

14   underwater diver that cleans boats and I believe he

15   passed away while cleaning a boat at the marina.  We

16   represented Mr. Kemp.

17    Q   And what was the allegation of negligence or

18   liability?

19    A   There were maintenance issues associated with

20   the electrical system -- of the electrical system of

21   the -- of the electrical system at the marina.

22    Q   Okay.  Then in 2022 you gave a deposition in

23   the Estate of Jerome Matthews versus Phillips 66 in

24   Louisiana --

25    A   Yes.

1    Q    -- what kind of case was that?

2    A    Mr. Matthews fell backwards into a -- in a

3  cooling water retention tank at a Phillips 66 plant.

4  And in that particular case, I don't remember which, we

5  were representing one of the co-defendants and I did an

6  inspection of that, of the site, and documented the

7  site photographs.

8    Q    Okay.  Also in 2022 Steven Streit,

9  S-t-r-e-i-t, versus Legacy Homes, what kind of case was

10  that?

11    A    That was a construction defect case.

12    Q    And who did you represent?

13    A    Mr. Streit and his trust.

14    Q    Okay.  And then in 2023,0 Costello Litsy (ph)

15  versus First United Methodist Church?

16    A    Yes.

17    Q    What kind of case is that?

18    A    That is a case where Ms. Litsy fell in an

19  outdoor venue.

20    Q    And who did you represent in that?

21    A    We represent Ms. Litsy in that manner.

22    Q    Okay.  What percentage of the cases you're

23  involved in regarding slip or trip and falls do you

24  represent the plaintiff as opposed to the defendant?

25    A    It probably varies practice specifically and

1 it can vary from year, but I say it could go from

2 anywhere from 40/60 to 60/40 in any given year just

3 depending on how they come in.

4   Q  I have another document that I've been

5 provided which is an invoice sent from ESI to

6 Mr. Cozad; do you have that invoice?

7   A  I do.  Let me pull that up.  Okay.

8   Q  That invoice, which is dated June 9th of 2023,

9 shows $7,494.96, is that for all work prior to that

10 date or --

11   A  That's for everything through the invoice, all

12 work up through the invoice date, that is correct.

13   Q  Have you been paid anything to date on this?

14   A  I believe --

15   MR. COZAD:  Objection to form on the last

16 one.  Sorry.

17   THE WITNESS:  I'm sorry?

18   MR. COZAD:  I just objected to the form on the

19 last question.

20   THE WITNESS:  Okay.  And can you repeat the

21 question there?

22   MR. COZAD:  You can answer.

23   MR. PUROW:  Yeah.

24 BY MR. PUROW:

25   Q  Have you been paid anything on this invoice to

1 date?

2    A  I think we've received a partial payment on

3 this invoice.  We have a retainer, so I think they paid

4 us partially less what we have for a retainer.

5    Q  Okay.

6    A  And we haven't -- we haven't applied the

7 retainer to any balances yet.

8    Q  Do you have any billable since the date of

9 this invoice?

10    A  Yeah, I know that we'll have billings for

11 preparation leading up to this deposition.

12    Q  Do you know how many hours that would entail?

13    A  I do not because we haven't generated the list

14 for it, so I haven't seen it.  It will probably get

15 generated -- this is the 22nd, it will get generated at

16 the end of this month, so I'll probably see it the

17 third or fourth day of September and Mr. Cozad will

18 probably see his invoice probably mid September.

19    Q  And what work would that entail?

20    A  Pertaining to --

21    Q  Meaning the work that you've done since the

22 date of this invoice, what has the work consisted of?

23    A  Oh.  Just reviewing the file, reviewing the

24 file production, and going back reviewing my report and

25 materials in preparation for deposition.

1    Q   Okay.  Sir, can you tell me what elements

2   contribute to a slip and fall?

3    A   What elements in -- what are you referring to?

4   That's kind of a general question, so --

5    Q   What factors do you consider in determining

6   what causes a slip and fall?

7    A   Yeah, some of the factors you would consider

8   would be the walking surface.

9   Q   Uh-huh.

10    A   Any surface that's going to come in contact

11   with the walking surface, so that's typically whoever's

12   walking, it would be what their shoe or their footwear

13   is, presence of potential for any contaminants on the

14   surface, that would be the three main ones.

15    Q   What about gait of the individual?

16    A   Say that again.  I didn't hear you.

17    Q   What about gait of the individual?

18    A   Well, I don't specifically look at someone's

19   gait as to whether that's -- that's more of a --that's

20   more of a bio -- engineering biodynamics, so I look at

21   gait only with respect to how they're walking and

22   looking for if there's a difference in the way a person

23   is walking relative to someone else, but to the extent

24   gait as someone's -- as a contribution to their fall,

25   that's more something that a medical professional would

1   look at.

2   Q   Well, I'm sure you've seen situations where

3   you're evaluating a surface where a slip occurs and

4   some people walk on that surface and do not slip and

5   other people walk on the surface and do slip, what

6   factors would determine whether one person slips and

7   another person doesn't?

8   A   There'd be multiple factors.

9   Q   What are those?

10   A   Those are going to be whether that person who

11   slips, did they encounter a contaminant that people

12   prior to didn't encounter.  It could also be the

13   person's footwear, if that person's wearing flipflops,

14   if that person has a smooth sole versus someone who has

15   spikes in the traction of their -- good -- has a newer

16   shoe, the spikes on the bottom of the soles of the

17   shoe, all of those things.

18   Q   Is that -- are those the only factors that

19   would contribute to one person slipping as opposed to

20   another?

21   MR. COZAD:  Objection; form.  You can answer.

22   THE WITNESS:  I don't know if those are the

23   only ones, but those would be the primary ones.

24   BY MR. PUROW:

25   Q   When were you first contacted regarding this

1 accident?

2   A  I have to look at the opening letter. Sent

3 the opening letter on May 10th. We typically conduct a

4 conflict check beforehand, so I would say somewhere

5 May 7th, 8th, somewhere in that area.

6   Q  Of this year?

7   A  Of 2023, correct, yes, sir.

8   Q  And who retained you?

9   A  Who retained us?

10   Q  Yes.

11   A  Yes, Derrevere, Hawks, Black and Cozad.

12   Q  On behalf of Wal-Mart?

13   A  On behalf of Wal-Mart is my understanding.

14   Q  Have you ever done any prior work on behalf of

15 that law firm with Mr. Cozad specifically?

16   A  I've worked for Derrevere, Hawks, and Cozad.

17 I've worked for John Derrevere before.

18   Q  How many times?

19   A  As I sit here today, if I can recall, three to

20 four.

21   Q  All on slip and falls?

22   A  Not necessarily slips, but they're all on

23 fall-related matters, could be a trip, something like

24 that.

25   Q  Were those all Wal-Mart cases?

1    A   Actually, this is the first Wal-Mart case I

2   worked on for them.

3    Q   Have you worked on any other cases for

4   Wal-Mart?

5    A   I have not.

6    Q   Now, yesterday afternoon I was provided with a

7   large number of documents by Mr. Cozad; do you know if

8   you were involved in the preparation of those documents

9   being provided to Mr. Cozad to be provided to me?

10    A   Involved as in --

11    Q   Gathering.

12    A   Yeah, I always review the file production to

13   make sure that everything is -- that everything's

14   there.

15    Q   Do you know if -- rather than my going through

16   them individually, to your knowledge, the documents

17   that I was provided, would that consist of everything

18   contained in your file?

19    A   Yes, sir.

20    Q   And what were you retained to do?

21    A   We were retained primarily to be a rebuttal

22   expert to Mr. Zimmerman.

23    Q   You were provided with Mr. Zimmerman's report?

24    A   I was.

25    Q   When was that?

1    A  I'll have to look in the correspondence file

2  to see when they sent us the first set of production

3  documents.

4    Q  Sure.

5    A  The Camp Long deposition was -- that's a

6  little small to see that one.  It was around May 22nd

7  we received documents and we also received a Camp Long

8  deposition.

9    Q  So May 22nd would have been when you received

10  the Zimmerman report?

11    A  Yeah.  It may have been -- we may have

12  received the Zimmerman report before that.  I'm looking

13  for it.

14    Q  Well, let me help you out.  It would have been

15  sometime between May 7th and May 27th, would that be

16  fair enough?

17    A  Yes.  Yes.  Correct.

18    Q  Okay.

19    A  If you're looking for a specific date, I'd

20  have to hunt and peck through the correspondence to

21  figure which e-mail they sent it to us in, but --

22    Q  Have you reviewed Mr. Zimmerman's deposition?

23    A  I did.

24    Q  When was that?

25    A  That we just received I think last week.

1    Q   Okay.  Did you go out to the scene?

2    A   I did not go out to the scene.

3    Q   Why not?

4    A   It's my understanding that from the -- that

5  the scene had changed by the time we were engaged to

6  look at this matter.

7    Q   Did anybody from your office go out to the

8  scene?

9    A   No.

10    Q   Has anybody from your office done any work on

11  this matter besides you?

12    A   I've worked on this -- on this matter, I had

13  my administrative assistant do work on this matter, and

14  the report was reviewed by (inaudible) as indicated on

15  the report cover.

16       THE COURT REPORTER:  I'm sorry to interrupt,

17    was reviewed by who?

18       THE WITNESS:  Zed.  Actually, his official

19    name is Zdenek, Z-d-e-n-e-k.  His last name is

20    Hejzlar, H-e-j-z-l-a-r.

21  BY MR. PUROW:

22    Q   Were you able to determine why Mr. Maribona

23  slipped?

24    A   I didn't hear that very well.  What did you

25  say?

1   Q   Were you able to determine why Mr. Maribona

2   slipped?

3   A   Specifically why, no.

4   Q   Yes.  You would agree that he slipped on the

5   white stop bar in front of the Wal-Mart, correct?

6   A   That is what the video depicts, correct.

7   Q   Do you have an opinion if whether or not

8   Mr. Maribona was negligent or did anything wrong

9   contributing to his slip?

10   A   I do not.

11   Q   You don't have an opinion or he -- you don't

12   believe that he did anything wrong or negligent?

13   A   I don't know that -- I don't know that he -- I

14   don't see -- I didn't see anything in the video to

15   indicate that he was doing anything wrong.

16   Q   Okay.  Have you spoken to any witnesses to the

17   slip?

18   A   I haven't spoken to any -- anyone other than

19   what's -- all I've seen what's in the file with respect

20   to deposition testimony.

21   Q   Now, you refer to -- in your report you refer

22   to three types of slips; am I correct?

23   A   Which portion of the report are you referring

24   to?

25   Q   Page six.

1    A   Let me open the report up.

2    Q   You have three diagrams.

3    A   Yeah, the three diagrams from -- from the

4  article by Botman, correct.

5    Q   I'm sorry, five, six, and seven.  And you

6  determined that the slip was a slip event where the

7  leading foot slides forward and the rear foot does not

8  causing a split, correct?

9    A   Yeah, it's very similar to that.  As I go on

10  in the report, Mr. Maribona doesn't do a full split

11  because he appears to have supported himself partially

12  with the cart.

13   Q   Okay.  You also have a gait analysis on the

14  prior page, correct?

15   A   We have a general description on the prior

16  page.  A gait analysis here is a general description

17  that's kind of prescriptive to -- to show people

18  generally how people walk and where the heel strike

19  function is in where people walk.

20   Q   How does this analysis contribute to

21  determining what happened with regard to Mr. Maribona's

22  slip?

23   A   Well, I mean, in looking at the video from --

24  looking at the video it appears he's starting to slip

25  as he makes the heel strike.

1    Q   Would you agree that somebody's gait can

2  contribute to whether or not they slip?

3    A   Well, there's some -- there's a research

4  article that looks into that and it seems that for the

5  most part, even in elderly people, the amount of

6  friction they require doesn't change much with their

7  gait.  Not to say it can't be a factor, but a lot of

8  research shows that the required coefficient of

9  friction for someone doesn't change that much unless

10  they have severe issues use like a prosthetic on one

11  side or something like that.

12    Q   So if someone is walking on a slippery

13  surface, there would be no significant difference if

14  they are walking with their steps straight up and down

15  as opposed to walking with more of a slide step?

16      MR. COZAD:  Objection; form.  You can answer.

17      THE WITNESS:  So can you repeat?  What are you

18    asking now?

19  BY MR. PUROW:

20    Q   Right.  If somebody is walking on a slippery

21  surface, are you saying there would be no significant

22  likelihood of slipping if they're walking with a slide

23  step as opposed to placing their feet directly straight

24  up and down?

25      MR. COZAD:  Objection; form.  You can answer.

1      THE WITNESS:  I don't know what you mean by a

2    slide step.

3  BY MR. PUROW:

4    Q   Walking where they slide as take the step.

5    A   I still don't understand what you mean by a

6  slide -- what is a slide step, I'm just trying to

7  understand what you're asking me to compare it to.

8    Q   Okay.  Well, are there different types of

9  gaits?

10    A   There are.

11    Q   And what -- what would be the different types

12  of gaits?

13    A   Well, whether people are, you know, moving

14  side to side or there's examples of them -- there's

15  examples of people walking in various fashions in the

16  video.

17    Q   And what would be the difference between the

18  people in the video as to how their gaits are

19  different?

20    A   Meaning what exactly?

21    Q   Well, you just said there are examples of

22  people walking with different gaits in the video and

23  I'm asking what are the different types of gaits that

24  are observed in the video?

25    A   Yeah, I mean, you can see people that have

1  longer strides, people that have shorter strides.

2    Q   Is that the only difference?

3    A   No, there are other differences, but it's --

4    Q   Now, you talk about in your report the fact

5  that a number of other people walked in the area and

6  did not slip, correct?

7    A   That is correct.

8    Q   What would cause one person to slip and

9  another person not to slip?

10    A   In this particular instance we're looking at

11  the -- we're basically determining if the painted

12  stripe is slip resistant and the fact that the other

13  people are able to negotiate the painted stripe without

14  issue would indicate that that's a slip resistant

15  surface.

16    Q   Okay, but that's not my question.  My question

17  is what would cause one person to slip and another

18  person not to slip at the same location?

19    A   If you -- if all things are equal, then

20  there's going to be probably a difference in the

21  traction surface of that person's shoe or the presence

22  or lack thereof of a contaminant.

23    Q   And when you say a contaminant, what would you

24  be talking about?

25    A   Well, there's a constant contaminant in the

1 video because it's constantly -- in the two hours of

2 the video, the surface is wet, so water is one constant

3 contaminant and it seems that most everyone is able to

4 effectively deal with that particular contaminant in

5 the video, so that means the introduction of a

6 contaminant that's not water, that probably would

7 increase the slip resistance.

8 Q  Such as what?

9 A  Could be anything.

10  Q  So give me some examples.

11  A  Yeah, so it could be oil, it could be

12 antifreeze.  You can see a number of cars that drive

13 through the parking lot continuously in between

14 pedestrians walking through, you can pick up a

15 contaminant with your shoe in one area and transfer it

16 to another.

17  Q  Do you see any evidence of that?

18  A  Meaning -- all I know is what is in the video.

19  Q  Right.  You indicated that the video shows

20 that there was water on the ground, correct?

21  A  Correct.

22  Q  Do you see any evidence of any other

23 contaminants?

24  A  No, because the resolution of the video

25 wouldn't be such that you could identify a small spot

1  of oil or a small spot of some other contaminant in the

2  video.

3     Q  Does the slip coefficient of the surface

4  affect the likelihood that somebody will slip?

5    A  Yes.

6     Q  Do you ever test for slip coefficient?

7    A  I did not because the surface had changed, so

8  any testing that I did would not be representative of

9  the conditions of the time that Mr. Maribona was there.

10     Q  Okay.  My question though is do you ever test

11  the slip coefficient?

12    A  Oh, I'm sorry.  Yes.

13     Q  How do you do that?

14    A  The particular device that we use is the

15  ASM 925.  That's a slip meter that measures the dynamic

16  coefficient of friction.

17     Q  Do you know if that testing device has ever

18  been disqualified in court?

19    A  I'm not aware that it has.

20     Q  Do you know the reliability of that testing

21  device?

22    A  Yes.  The reliability of it has been confirmed

23  through inner-laboratory studies with multiple people

24  using multiple -- multiple people using the device on

25  the same surface to see if there's any variances in

1 user, machine, and user-related errors and

2 machine-related errors.

3    Q   Is there a difference in slip coefficient

4 between a -- excuse me, Siri was talking to me.

5       MR. COZAD:  Technology.

6       MR. PUROW:  Yeah.

7 BY MR. PUROW:

8    Q   Is there a difference in slip coefficient on

9 pavement that is unpainted and pavement that is

10 painted?

11    A   Define pavement.

12    Q   As in this parking lot.

13    A   Yeah, so there's actually -- there's actually

14 a research study that was done that actually showed

15 that taking different pavement surfaces which included

16 asphalt, smooth, and brushed concrete, they did a

17 comparison of those surfaces painted and unpainted and

18 found very little difference, didn't find a

19 statistically significant difference in the coefficient

20 of friction in the painted surfaces versus the

21 unpainted surfaces.

22    Q   Can you cite me on that?

23    A   Yeah.  It's a 2007 study.  It's the

24 Effects of Walking -- or the Effects of Painting

25 Surfaces.  I can get you the full title.

1  Q   And where is that published?

2  A  I don't have it in here because I was looking

3  at that -- I was looking at that more recently, so it's

4  not in the -- it's probably in the reference list.

5  Q   So it's a type of paint that is used to test

6  the slip coefficient?

7  A  It could.

8  Q   Depending on what?

9  A  Don't know.  I'm not a paint expert.

10  Q   Well, are you aware that there are certain

11  paints that have additives in order to make them less

12  slippery?

13  A  Yeah, I'm aware of that.

14  Q   Okay.  What type of additives are those?

15  A  They can be anywhere from -- they can use

16  abrasive additives, they can actually use additives

17  that don't change the surface appearance at all.  It

18  just changes the properties of the paint.

19  Q   Why do they use additives?

20  A  Depends on what the use is going to be.

21  Q   Well, on paints that are on walking surfaces,

22  why do they use additives?

23  A  They would try to use them to help improve the

24  slip resistance of the paint depending on the type of

25  paint that it is.

1   Q  Are there factors that affect how long paint

2  lasts before it loses the effectiveness of the

3  additives?

4    MR. COZAD:  Objection; form.

5    THE WITNESS:  I'm sure that there are.  I

6  mean, this paint is outside and it's subject to

7  environmental factors, sun, weather, vehicular

8  traffic.

9  BY MR. PUROW:

10   Q  Have you done any research on this particular

11  paint?

12   A  I have not.

13   Q  Do you know when the paint was -- strike that.

14    Do you know when the stop bar was last painted

15  before the incident in question?

16   A  I would have to review the production.  I

17  think it was somewhere between the year or two years

18  prior.

19   Q  Would that make a difference as to the slip

20  coefficient of the paint?

21    MR. COZAD:  Objection; form.

22    THE WITNESS:  Without testing it new and

23  without testing it after two years, no way to

24  know.

25  BY MR. PUROW:

1    Q   Okay.  I want you to assume that the paint

2  that was used had an additive to make it less slippery,

3  would the length of time between the time the stop bar

4  was painted and the time of the slip in Mr. Maribona's

5  case affect the slip coefficient of the paint?

6        MR. COZAD:  Objection; form.

7        THE WITNESS:  There's no way of knowing

8    without knowing what type of additive it is and

9    what those properties are.  You'd have to -- if

10    you want to know that answer, you have to

11    basically test it and see what the wear rate is

12    over time.

13  BY MR. PUROW:

14    Q   Well, was part of your assignment in this case

15  to determine if the stop bar was slippery?

16    A   Part of our assignment was -- our assignment

17  was to determine whether it was slip resistant in

18  conformance with the code.

19    Q   How would you be able to determine that if you

20  did not do any research into the particular paint used?

21        MR. COZAD:  Objection; form.

22        THE WITNESS:  Because the available --

23    information we had available to us is -- was the

24    video and from the video we were able to establish

25    an incident rate and from -- so we established an

1    incident rate from the video that correlates with

2    public research for slip resistance.

3  BY MR. PUROW:

4    Q   So when you say the incident rate, you're

5  saying X number of people walked there and how many

6  people slipped, correct?

7    A   Correct.  Incident rate from published

8  research is based on the percentage of footsteps.

9    Q   Go ahead.  Did I cut you off?

10    A   Yeah, if you want to repeat your question,

11  I didn't know where you were going.

12    Q   So let me move on.  So did you do anything

13  different than what I could have done as far as

14  watching the video and counting the number of people

15  and how many slip?

16    A   Yeah, because I looked at the video to see if

17  anyone was even marking partial slips or slip and

18  recoveries particularly with the 118 people that

19  physically stepped on the stop bar.  And then we do the

20  statistical analysis of that to determine how many

21  steps people would be taking going across the white

22  painted steps -- stripes to enter the -- to enter the

23  store.

24    Q   So in order to determine whether or not the

25  stop bar was unduly slippery, all you did was look to

1  see if anybody else slipped; is that correct?

2      MR. COZAD:  Objection; form.

3      THE WITNESS:  We look to see if anyone else

4   slipped and from that we did a statistical

5   analysis.

6  BY MR. PUROW:

7      Q   Did you do anything else or was that the

8  totality of the investigation you did in making your

9  determination?

10     A   Oh, no, because the physical analysis we tied

11  back to published research that shows that people

12  that -- once you -- at certain levels of coefficient of

13  friction the risk of slipping decreases, so as the

14  coefficient of friction increases when people utilize,

15  that coefficient of friction increases, the risk of

16  slipping decreases.

17     Q   And that was 22 hours of work?

18      MR. COZAD:  Objection; form.

19      THE WITNESS:  The research that we did and

20   then also the offering of the report and the

21   review of the literature, yes.

22  BY MR. PUROW:

23     Q   Did you look at the literature provided by

24  Sherwin Williams with regard to the paint used?

25     A   I saw the document that was produced in

1 production.  I think it's a one-page -- a one or

2 two-page, two-sided document, something like that.

3   Q   And did you review that?

4   A   I'm sorry?

5   Q   Did you review it?

6   A   Yes.

7   Q   Okay.  Because actually the documentation from

8 Sherwin Williams is five pages; did you review all five

9 pages?

10   A   What document are you -- are you talking

11 about -- which document are you talking about?

12   Q   The traffic and zone products.

13   A   Let me look at it.

14   Q   I believe it's Exhibit No. 7 to

15 Mr. Zimmerman's report.

16   A   You're going to find it there or in the

17 production.

18     MR. COZAD:  Looks like page 70 --

19     THE WITNESS:  Yeah, I'm almost there.  So I'm

20  here.

21 BY MR. PUROW:

22   Q   Did you review all the pages?

23   A   Yeah, I had seemed to recall it looked like a

24 two-page document, but I'm confused about that.  It's

25 four pages.

1    Q   And would you agree that the paint is slippery

2  when wet?

3       MR. COZAD:  Objection, form.

4       THE WITNESS:  All I know is there's a --

5    there's the discussion that there's a portion of

6    this document that says that the paint could

7    become slippery when wet, yes.

8  BY MR. PUROW:

9    Q   Okay.  Would that concern you in painting --

10  using this paint on the ground in an area where it

11  becomes wet and pedestrians walk?

12       MR. COZAD:  Objection to form.

13       THE WITNESS:  I don't know what their basis

14    for that -- I don't know what their basis for

15    adding that warning to the paint documentation is

16    because it's approved for -- it's approved for

17    traffic marking paint and it's approved for use in

18    parking lots, so it should be -- they should be

19    aware that people are going to be walking on it.

20  BY MR. PUROW:

21    Q   Well, you're aware of the fact that they

22  indicate that the paint should not be used in large

23  areas subject to pedestrian traffic?

24    A   Yes.  And I think they actually define what

25  that is in terms of don't paint an entire parking stall

1  a solid color.

2  Q   No, no, they don't define it as that way, they

3  use that as an example.

4  A   They define it as an example, correct.

5  Q   Okay.  Why would you -- if a paint is

6  slippery, why would you not want to paint it in a large

7  area as opposed to a small area?

8  MR. COZAD:  Objection; form.

9  THE WITNESS:  A larger area might be more

10  subject to holding and containing contaminants on

11  the surface of the paint.

12  BY MR. PUROW:

13  Q   Why?

14  A   It's a large area, so it's depending on a

15  number of factors.  You know, particularly a parking

16  lot stall you could have an automobile that's

17  constantly dripping stuff on the surface of the paint

18  there.

19  Q   Okay.  But it's not restricted to parking lot

20  stalls, correct?

21  A   Correct.  I mean, this is a traffic marking

22  paint, so I'm assuming that's what they're using it

23  for.

24  Q   Well, wouldn't it be reasonable to assume that

25  if you used it to paint a -- let's say a white stripe

1  between parking stalls, it would be narrow enough where

2  if somebody was to step on it that their foot would

3  also be on a nonpainted surface as opposed to a large

4  painted area where their entire foot would be on the

5  paint surface?

6    A   Yes.  I mean, so on a painted area you might

7  have -- be taking multiple steps on that same surface.

8    Q   Right.  And you would agree that the parking

9  stop involved in this incident was wide enough for

10  somebody's entire foot to step on the painted surface,

11  correct?

12    A   Sure.  And all of the painted stripes between

13  the stop bar and the store are also wide enough that

14  someone could put their whole foot on them.

15    Q   Perpendicular to the paint or only if they

16  stepped horizontally on the paint?

17    A   Perpendicular to the paint.

18    Q   So you're saying that the stripes that are

19  between the stop bar and the front of the store are

20  wide enough where somebody's entire foot would fit on

21  to the painted surface?

22    A   Yes.

23    Q   How wide are those stripes?

24    A   They appear to be at least one foot wide.

25    Q   Okay.  How did you determine that?

1   A   From aerial photograph analysis.

2   Q   Where did you do that?

3   A   I'm sorry?

4   Q   Where in your report is that analysis?

5   A   It's part of what we -- it's part of the -- in

6 the work product file my analysis of the different

7 widths is in the work product file; that's what we use

8 to establish the incident rate.

9   Q   How would I get to that in the work product

10 section?

11   A   So in our file production there should be a

12 2.0 work product.

13   Q   I have 2.501, patron step analysis; 2.502,

14 distance analysis; 2.901, a reference list, step on

15 stop bars, stills, and AIG.  Which one would I look at?

16   A   You would be looking at the distance analysis.

17   Q   Okay.  And where is the width of the lines?

18   A   So the stop bar itself is -- measures to be

19 roughly two feet in the aerial photograph.

20   Q   Uh-huh.

21   A   And Mr. Zimmerman I think also measured it

22 around two feet in his photographs and the stop bars

23 appear to be roughly -- you know, roughly half to

24 three-quarters of the width of the stop bar.

25   Q   Based on what analysis?

1    A   Looking at this in a planar view, basically if

2   we know that this dimension is two feet, this is taken

3   at the same view at the same distance it.  Those stop

4   bars are slightly thinner -- the crosswalk bars are

5   thinner than the -- are thinner than the stop bar.

6    Q   By the way, what are the purpose of those

7   lines?

8    A   I'm sorry?

9    Q   What are the purpose of those lines?

10    A   They're to alert vehicles that that's a

11   pedestrian crossing area.

12    Q   So you would expect pedestrians to be walking

13   in that area?

14    A   That is correct.

15    Q   And you would also expect pedestrians to be

16   walking where the stop bar is, correct?

17    A   Correct.

18    Q   So the store should take all steps necessary

19   to ensure that the stop bar is safe for pedestrians,

20   correct?

21        MR. COZAD:  Objection; form.  You can answer.

22        THE WITNESS:  How do you define safe?

23   BY MR. PUROW:

24    Q   How do you define safe?

25        MR. COZAD:  Objection; form.

1      THE WITNESS:  Stop bar is -- we have no

2    incidences of anyone -- we only have one person

3    slipping there in the last six months.

4  BY MR. PUROW:

5    Q   How do you know that?

6    A   That is my understanding in the discovery

7  document, one of the answers in the defendant's

8  discovery is there was no incidents in the last six

9  months and I think in the Kamara deposition he's not

10  aware of anything in the six years he's had the job of

11  investigating incidents.

12    Q   Could there be incidents that weren't reported

13  to Wal-Mart?

14      MR. COZAD:  Objection; form.

15      THE WITNESS:  There could be, but --

16  BY MR. PUROW:

17    Q   How do you know --

18    A   We have no way of determining what is or isn't

19  reporting.  They can only go by what they know.

20    Q   Mr. Maribona didn't report it to Wal-Mart, did

21  he, initially?

22    A   As far as I know, he didn't report it

23  initially according to the Kamara depo.

24    Q   So you have no idea how many people slipped at

25  that location, you only know how many were reported,

1 correct?

2     MR. COZAD:  Objection; form.

3     THE WITNESS:  That is correct.

4 BY MR. PUROW:

5   Q   I mean, if somebody slipped and didn't fall

6 down, you wouldn't expect them to report it, would you?

7     MR. COZAD:  Objection; form.

8     THE WITNESS:  Don't know.  They may, they may

9   not report.

10 BY MR. PUROW:

11   Q   Okay.  So when you say nobody slipped in six

12 months, you don't know if that's a true statement or

13 not, correct?

14     MR. COZAD:  Objection; form.

15     THE WITNESS:  We know that no one was -- we

16   know that no one has reported a slip in six

17   months.

18 BY MR. PUROW:

19   Q   Okay.  But that doesn't tell you if anyone

20 slipped or not?

21   A   No.  But if there was a systemic issue, you

22 would expect multiple reported issues.

23   Q   But going back to my original question, you

24 would expect that Wal-Mart would take all steps

25 necessary to make sure that the stop bar is safe for

1  pedestrians, correct?

2       MR. COZAD:  Objection; form.

3       THE WITNESS:  I don't know that they didn't do

4    that.

5  BY MR. PUROW:

6    Q   But my question is, it would be their

7  responsibility to take all steps necessary to make sure

8  the stop bar was as safe as possible for pedestrians,

9  correct?

10       MR. COZAD:  Objection; form.

11       THE WITNESS:  The indications are that it's

12    safe.

13  BY MR. PUROW:

14    Q   Well, I'm not asking you whether it was safe

15  or not safe in this question.  I'm asking you whether

16  it was their responsibility to take all steps necessary

17  to ensure that it was as safe as possible for

18  pedestrians, correct?

19       MR. COZAD:  Objection; form.

20       THE WITNESS:  Sure.

21  BY MR. PUROW:

22    Q   And that would include using slip resistant

23  paint, correct?

24       MR. COZAD:  Objection; form.

25       THE WITNESS:  There's no indication the paint

1    itself isn't slip resistant.

2  BY MR. PUROW:

3    Q   That's not my question.  My question is trying

4  to make it as safe as possible, that would include

5  using slip resistant paint, correct?

6        MR. COZAD:  Objection; form.

7        THE WITNESS:  Yes.

8  BY MR. PUROW:

9    Q   And Wal-Mart would have a responsibility to

10  periodically check the paint to see if the slip

11  resistance of the paint had worn away over time due to

12  environmental conditions, correct?

13    A   Not necessarily.  If they're not -- if there's

14  no -- if they have no -- if they don't know -- if

15  there's no issue there, there would really be no --

16  they have a periodic repainting schedule is my

17  understanding.  They repaint them every two years

18  regardless, so if they're not aware of an issue with

19  the paint, there would be no need for investigation.

20    Q   So you're saying there would be no need to

21  check to see if it's safe until after somebody falls,

22  correct?

23        MR. COZAD:  Objection; form.

24        THE WITNESS:  No.  Risk mitigation strategy

25     involves determining where hazards are and then

1    mitigating those hazards.  If there's not a

2    hazard, there's nothing to mitigate.

3  BY MR. PUROW:

4    Q   Well, isn't it Wal-Mart's responsibility to

5  check to see if a hazard has developed?

6      MR. COZAD:  Objection; form.

7      THE WITNESS:  If they're not on notice if

8    there's a hazard, there's nothing to check.

9  BY MR. PUROW:

10    Q   Well, there's two ways that they'd be on

11  notice; one is if somebody slipped and fell and the

12  other is if they went out and did a preemptive check to

13  see if it was safe, correct?

14      MR. COZAD:  Objection; form.

15      THE WITNESS:  If nobody is slipping, there'd

16    be no reason to check it.

17  BY MR. PUROW:

18    Q   Okay.  So what you're saying is they don't

19  need to check it until after somebody slipped?

20      MR. COZAD:  Objection to form.

21      THE WITNESS:  That is not what I'm saying.

22    It's misstating, you know -- they periodically --

23    they already have a routine maintenance program

24    for the painted stripes, so -- and they're not

25    having any issues between the painting based on

1   the information in production, so I'm not sure

2   what the -- why they would be out there just

3   arbitrarily checking the paint.

4   BY MR. PUROW:

5   Q   Now, the paint had cracks in it, correct?

6   A   The paint had what in it?  I'm sorry.

7   Q   Cracks?

8   A   There are some -- in Mr. Zimmerman's photos

9   there appears to be some cracks reflecting through the

10   surface of the paint.

11   Q   And those cracks would develop over time,

12   correct?

13   A   Correct.

14   Q   Now, it's your opinion that the cracks make

15   the stop bar less slippery, correct?

16   A   They could provide tractive properties to the

17   stop bar.

18   Q   Then why doesn't Wal-Mart ensure that cracks

19   are placed in all their painted areas to make them less

20   slippery?

21   MR. COZAD:  Objection; form.

22   THE WITNESS:  Well, the traction can also

23   mitigate -- it's a two-edged sword.  The cracks

24   can also mitigate some, it can also allow for

25   contaminants to come up from the surface of the

1   asphalt.

2  BY MR. PUROW:

3    Q   Did that happen in Mr. Maribona's case?

4    A   It's one factor that could have happened.

5    Q   Okay.  So you can't tell me one way or the

6   other whether Mr. Maribona's slip was caused by

7   contaminants coming up through the cracks, correct?

8    A   No.  And we don't know if the surface was

9   cracked at the time of Mr. Maribona's slip.  We only

10  know it was cracked at the time of Mr. Zimmerman's

11  study six months later.

12   Q   What would cause the cracks?

13   A   I'm sorry?

14   Q   What would cause the cracks?

15   A   Any number of environmental -- any number of

16  environmental factors we talked about earlier, sun,

17  weather, time; that's why they periodically repaint

18  them.

19   Q   And you would expect that if the stop bar was

20  recently painted, which we know it wasn't, but when it

21  was recently painted, you would not expect to see

22  cracks, correct?

23   A   I wouldn't think so if you were there right

24  after it was painted.

25   Q   You watched how long a period of time on the

1 video?

2    A   I watched the entire video from beginning to

3 end.

4    Q   Which was how long a period of time?

5    A   It's a two-hour video.

6    Q   Okay.  During that two hours, how many people

7 stepped in the same area of the stop bar where

8 Mr. Maribona stepped?

9    A   Let me check the report, but I believe we have

10 three prior to and I don't think I counted who stepped

11 there after.

12    Q   Can certain areas of the stop bar be more

13 slippery than other areas?

14    A   Based on the analysis of people crossing the

15 stop bar, it doesn't appear to be that it's different.

16    Q   Could different areas of the stop bar be more

17 slippery than other areas?

18        MR. COZAD:  Objection; form.

19        THE WITNESS:  Say that again.

20 BY MR. PUROW:

21    Q   Could different areas of the stop bar be more

22 slippery than other areas of the stop bar?

23    A   Based on the information that we have, it

24 doesn't appear that there's any real difference.

25 People walk across almost every portion of the stop bar

1  at some point in time, so there's no visible indication

2  that there's any real significant difference.

3    Q   Could the amount of contaminants in one area

4  be different than other areas?

5       MR. COZAD:  Objection; form.

6       THE WITNESS:  Could be.

7  BY MR. PUROW:

8    Q   Then different parts of the stop bar could be

9  more slippery than other parts of the stop bar,

10  correct?

11       MR. COZAD:  Objection; form.

12       THE WITNESS:  To the extent that there's a

13    contaminant, yes.

14  BY MR. PUROW:

15    Q   Okay.  So when you analyze how many people

16  walked on the stop bar without slipping, when people

17  walked in other areas of the stop bar, that may be

18  irrelevant, correct?

19       MR. COZAD:  Objection; form.

20       THE WITNESS:  Well, the stop bar is painted --

21    uniform painted surfaces.  It's all painted at the

22    same time, so I don't necessarily know that that's

23    irrelevant.

24  BY MR. PUROW:

25    Q   Can you tell how slippery something is by

1 feeling it?

2   A  I've seen no published research that defines

3 risk of falling based on just feeling the surface with

4 your hand.

5   Q  So are you saying you can't tell if something

6 is slippery by feeling it?

7   A  You can't determine whether there's an

8 increased or decreased risk of falling on that surface

9 just by feeling it, no.

10   Q  So if you were to run your hand over a

11 gravelly surface, as opposed to a painted surface, you

12 can't tell if one is more slippery than another?

13   A  You'll feel tactile differences in the

14 surface, but you really won't know what -- what effect

15 those differences in those surfaces have while without

16 actually seeing if there's a difference without

17 testing.

18   Q  If you run your hand over ice, can you tell

19 that it's slippery?

20   A  Well, it depends what temperature your hand is

21 at. Because when your hand is at body temperature, you

22 automatically start to melt the surface of the ice.

23 Very dry ice is not as slippery as ice that starts to

24 have a little film of water on the top of it.

25   Q  So you're saying you can't tell if you run

1  your hand over ice that it's slippery?

2      MR. COZAD:  Objection; form.

3      THE WITNESS:  You can tell that -- you could

4  feel the surface of the ice, but most people that

5  are walking, and they know they're walking on ice,

6  they can walk on ice without slipping.

7  BY MR. PUROW:

8      Q   How do they do that?

9      A   They basically just change the way they're

10  walking, they walk more slowly, they walk more

11  carefully.

12      Q   So the way somebody walks does affect the

13  likelihood of them falling, correct?

14      A   It could.

15      Q   Now, Mr. Zimmerman went out to the scene

16  before it was repainted, correct?

17      A   It's my understanding that he was there before

18  it was repainted.

19      Q   And he ran his hand over the painted surface,

20  correct?

21      A   That's what he states in his deposition.

22      Q   So he would have a better idea of whether it

23  was slippery than you would, correct?

24      MR. COZAD:  Objection; form.

25      THE WITNESS:  Not necessarily.

1 BY MR. PUROW:

2   Q  Why?

3   A  Because there's no way to correlate what

4 Mr. Zimmerman feels with his hand with any published

5 research as to what is or isn't slippery.

6   Q  Okay.  So you're saying that somebody feeling

7 the surface doesn't have a better idea of whether or

8 not it's slippery than somebody who doesn't feel the

9 surface?

10     MR. COZAD:  Objection; form.

11     THE WITNESS:  Well, he didn't know -- he

12   apparently didn't feel it was necessary to look at

13   the video or do any analysis to correlate why and

14   he doesn't explain with his hand test why anyone

15   else slipped.

16 BY MR. PUROW:

17   Q  Are you saying that Mr. Zimmerman did not look

18 at the video?

19   A  I'm not saying he didn't look at the video,

20 but he had the same opportunity to do the same

21 statistical analysis that I did and it didn't look like

22 he did that to determine whether the surface was slip

23 resistant.  He literally only relied on his feeling

24 with his hand to determine whether it was slip

25 resistant or not.

1  Q   And feeling with the hand is not consistent

2  with somebody being able to determine if the surface is

3  slippery?

4  A   They won't be able to correlate any published

5  research to determine that.

6  Q   Okay.  So back in the day, before there was

7  published research, it would be impossible for anybody

8  to tell if something was slippery by feeling it?

9     MR. COZAD:  Objection; form.

10     THE WITNESS:  I don't understand what back in

11    the day has to do with this.

12  BY MR. PUROW:

13  Q   Well, you're saying that you can only

14  determine if something is slippery when feeling it by

15  comparing it to published research.  Well, before there

16  was published research, could somebody determine if the

17  surface is slippery?

18     MR. COZAD:  Objection; form.

19     THE WITNESS:  I mean, it would just be a

20    relevant comparison.

21  BY MR. PUROW:

22  Q   It would be what?  I'm sorry.

23  A   It would be a relevant comparison that you

24  wouldn't know if it's slippery in terms of being a

25  hazard unless people are falling it because there's

1  people that -- you can feel something and people don't

2  fall on it.  You can touch it with your hand and say

3  that it's slippery, but if nobody falls, is it in fact

4  slippery.

5    Q  Did somebody fall?

6    A  One person.

7    Q  Well, does that make it a hazard?

8    A  Depends on how you define a hazard.

9    Q  Well, you would -- I thought you were saying

10  it's determined by whether or not somebody falls.

11    A  Yeah, the issue is whether the surface is slip

12  resistant.  There's -- no surfaces are slip proof.  One

13  person falling is an indication that someone can fall;

14  that doesn't mean it's not slip resistant.  It just

15  means that it's not slip proof, but those surfaces are

16  slip proof.

17    Q  But for the fact that nobody falls for a

18  period of time doesn't mean that the surface is not

19  slippery, correct?

20      MR. COZAD:  Objection; form.

21      THE WITNESS:  It means the surface is slip

22    resistant.

23  BY MR. PUROW:

24    Q  Well, how does it mean that?

25    A  I'm sorry?

1    Q   How does it mean that?

2    A   How did I do what?

3    Q   How does it mean that?  You said that

4 people -- if a number of people don't slip, that means

5 it's slip resistant?

6    A   Correct.

7    Q   How does it mean that?

8    A   How does it mean that?

9    Q   Yeah.

10    A   Well, because -- because we have published

11 research that once you reach a certain slip resistance,

12 risk of falling can go up to one in a million.  We did

13 a statistical analysis based on the video that in

14 patron footsteps the risk of falling on the painted

15 stripes exceeds one in a million.

16    Q   What research is that?

17    A   It's the study that's on page -- it's PDF

18 page 11 and it is document page 9 of 16.

19    Q   PDF 11?

20    A   Yeah.  If you're looking at the PDF viewer,

21 it's page number 11.  If you're looking at the

22 document, it's page 9.

23    Q   I'm sorry, what PDF?

24    A   I don't know how you're viewing the document.

25 You're looking at the report?

1    Q   I have your report, correct?  What page of

2  your report is it?

3    A   Page 9 of 16.  Page numbers are on the bottom

4  right.

5    Q   Okay.  Okay.  I'm looking at page nine --

6    A   Down towards the bottom.

7    Q   Yeah, table one?

8    A   Yep.  Risk of falling with respect to

9  friction.

10    Q   Okay.  Can you explain the table to me?

11    A   Sure.  Let me make a little larger where I can

12  read it on my screen.  The lead in the report kind of

13  has the explanation that you basically have coefficient

14  of friction of surfaces and you have utilized

15  coefficient of friction versus available coefficient of

16  friction, so a lot of people utilize much less while

17  walking.  And in this particular study which they use

18  forced plates and known, that known coefficient of

19  friction, that with coefficient friction -- available

20  coefficient of friction values of .36 to .396, the risk

21  of falling is one in a million.

22    Q   Why did you use that line?

23    A   I'm sorry?

24    Q   Why did you use that line?

25    A   Why did I use which line?

1  Q   The line that is for one in a million?

2  A   Well, the whole table is there, there's 1 in

3  20, there's 1 in 200, there's 1 in 10,000, there's

4  1 in 100, there's 1 in 1,000,000.

5  Q   Okay.  Why not use the 1 in 20 line?

6  A   Well, because we used -- we did the

7  statistical analysis based on the video for a period of

8  six months and that analysis gave us anywhere from one

9  in a million to one in seven million footsteps risk of

10  fall.

11  Q   And how many people slipped?

12  A   As far as we know, in the last six months we

13  have Mr. Maribona and no one prior.

14  Q   No, that's not my question.  How many people

15  slipped?

16  A   The available information is Mr. Maribona is

17  the only person that we're aware of that slipped in the

18  prior six months.

19  Q   You don't know am how many people slipped,

20  correct?

21     MR. COZAD:  Objection; form.

22     THE WITNESS:  We only have the information

23     that we've been provided.

24  BY MR. PUROW:

25  Q   Did the conditions of the stop bar change in

1  six months?

2    A   As far as I know the stop bar was not

3  repainted in that six-month period prior to his fall.

4    Q   That's not my question.  Did the condition of

5  the stop bar change in the six months?

6      MR. COZAD:  Objection; form.

7      THE WITNESS:  The whatever the weathering

8    pattern is going to be for six months, then

9    there's probably some weathering to it.

10  BY MR. PUROW:

11    Q   Then why do you go back six months -- well,

12  you don't know how long the condition on the day

13  Mr. Maribona slipped, you don't know how long that

14  condition existed, do you?

15    A   We do not.

16    Q   Then you would agree that your analysis can't

17  be relied on, correct?

18      MR. COZAD:  Objection; form.

19      THE WITNESS:  I don't agree that my analysis

20    can't be relied because the entire parking lot is

21    painted with the same white stripes.  The analysis

22    is based on people walking not only the stop bar,

23    but on the painted white stripes that everyone

24    needs to cross to enter the store.

25  BY MR. PUROW:

1    Q   But not all the stop -- not all the painted

2   areas are subject to the same condition, correct?

3       MR. COZAD:  Objection; form.

4       THE WITNESS:  Yeah, but what's at issue is

5    whether the paint is slip resistant and it's the

6    same paint everywhere.

7   BY MR. PUROW:

8    Q   Do you know when other areas were painted?

9    A   It's my understanding that the parking lot is

10   repainted all at the same time.

11    Q   Now, certain areas have cars drive over it

12   more than other areas, correct?

13    A   Correct.

14    Q   That would effect the slip resistance of

15   painted areas, correct?

16    A   Correct.

17    Q   So what you're saying is that Wal-mart gets

18   one free fall that until somebody falls, they don't

19   have to make sure if a painted area is safe?

20       MR. COZAD:  Objection; form.

21       THE WITNESS:  No, that's not what I'm saying.

22   BY MR. PUROW:

23    Q   But didn't you say that they had no obligation

24   to check the paint unless they were notified that

25   somebody slipped?

1      MR. COZAD:  Objection; form.

2      THE WITNESS:  They have a periodic repainting

3   schedule and they maintain the paint and they

4   haven't been aware that the paint is an issue.

5   BY MR. PUROW:

6      Q   Because nobody reported it, correct?

7      MR. COZAD:  Objection; form.

8      THE WITNESS:  If nobody reports it, how are

9   they to know?

10   BY MR. PUROW:

11      Q   They can inspect it, can't they?

12      A   They periodically inspect and repaint the

13   parking lot.  They still --

14      Q   Every two and a half years, correct?

15      A   Based on the schedule, it can vary anywhere

16   from one and a half to two and half. if I understand,

17   that's where they are in the rotation, but --

18      Q   Were any of Mr. Zimmerman's conclusions

19   incorrect?

20      MR. COZAD:  Objection; form.

21      THE WITNESS:  What do you mean by incorrect?

22   Which conclusion?

23      MR. COZAD:  Actually, I would instruct not to

24   answer that.  Malcolm, you know that one expert

25   commenting on another expert's opinions is

1    inappropriate.

2        MR. PUROW:  Well, whether or not it's

3    admissible is different than whether or not I

4    could ask him about it.  Why can't I ask him about

5    it?

6        MR. COZAD:  Well, I think you're kind of

7    crossing the line, don't you think?

8        MR. PUROW:  Isn't that why he was retained?

9        MR. COZAD:  Go ahead and ask.

10   BY MR. PUROW:

11       Q   Do you disagree with any of Mr. Zimmerman's

12   conclusions?

13       A   Yeah, I think we covered Mr. Zimmerman's

14   report in our report starting on page 12.

15       Q   Okay.  So with regard to Mr. Zimmerman's

16   report, what do you disagree with?

17       MR. COZAD:  Objection to form.  You can

18   answer.

19       THE WITNESS:  Well, we state on his -- we

20   basically -- he doesn't -- he didn't conduct any

21   testing to support his opinion that there was

22   variation in the available traction or that the

23   walking surface was not uniformly slip resistant.

24   BY MR. PUROW:

25       Q   And neither did you?

1     A   No.  I did a statistical analysis to determine

2   that the walking surface was slip resistant.  I didn't

3   have the -- I wasn't able to test the surface as it was

4   at the time of his fall.

5     Q   Okay.  Do you have any degrees in statistics

6   or math?

7     A   Yeah, I covered -- statistics was covered in

8   my construction degree as part of my undergraduate

9   studies and statistics is also a portion of the -- as

10   it pertains to doing safety analysis, a portion of my

11   CFP certification.

12     Q   You don't have a degree in it, do you?

13     A   I do not have a degree in statistics.

14     Q   Okay.  So what else do you disagree with in

15   Mr. Zimmerman's report?

16         MR. COZAD:  Objection; form.  You can answer.

17         THE WITNESS:  Yeah, Mr. Zimmerman appears to

18   pull some codes, but doesn't actually provide any

19   opinion or basis to indicate whether the store was

20   or wasn't in compliance and we reviewed the

21   Collier County code enforcement records online and

22   we didn't find any code enforcement violations

23   with this -- with the pavement markings.

24   BY MR. PUROW:

25     Q   Okay.  Anything else?

1    A   He opines that Wal-Mart failed to provide a

2   uniformly slip resistant walking surface.

3    Q   Okay.  Is that incorrect?

4    A   Yep.  With respect to the paint the stop bar,

5   he states the surface presented a smooth, nonporous

6   surface.  And looking at his photos, the photos, they

7   didn't appear to be smooth.

8    Q   Okay.  Anything else you disagree with in his

9   report?

10    A   We want to just read this whole section of the

11   report or --

12    Q   No, tell me.  By the way, can you tell by

13   inspecting a painted surface if it provides a smooth,

14   nonporous surface?

15       MR. COZAD:  Objection; form.

16       MR. PUROW:  What's wrong with the form?

17       MR. COZAD:  You asked him to speculate based

18    on someone's observations.

19   BY MR. PUROW:

20    Q   Can you tell by inspecting a painted surface

21   if it's a smooth, nonporous surface?

22       MR. COZAD:  Objection; form.

23       THE WITNESS:  Are you speaking -- are you

24    speaking just generally walk up to a surface and

25    tell if it's smooth or not or --

1  BY MR. PUROW:

2    Q   By inspecting it, uh-huh.

3    A   You should be able to differentiate between

4  whether it's smooth or not smooth.

5    Q   Okay.

6    A   Whether it's porous or not, you may actually

7  need to use a microscope or something to determine if

8  there's actual porosity, I mean, but --

9    Q   What else do you disagree with him on?

10    A   He misstates the -- he misstates several of

11  the codes as requiring them to be uniformly slip

12  resistant.  Actually, none of the codes actually

13  use the term uniformly.

14    Q   Anything else you disagree with him on his

15  report?

16    A   He cites the egress chapters of the Florida

17  building code and the life safety code and those

18  specific sections of those codes apply to inside of a

19  structure, they don't apply to the actual parking lot

20  outside a structure.

21    Q   Anything else?

22    A   I think he cites 4.5, which is accessible

23  routes and he also uses the term uniformly slip

24  resistant there and that's a portion of the code just

25  says surfaces should be slip resistant.  He restates a

1 couple of opinions.

2   Q  Okay.  Let's get to your -- by the way, do you

3 disagree with anything in his deposition?

4     MR. COZAD:  Objection; form.

5     THE WITNESS:  What do you mean by disagree

6   with anything in his deposition?  That's a -- a

7   that's a --

8 BY MR. PUROW:

9   Q  Do you disagree with any opinions that he has

10 in his deposition or any findings that he has?

11     MR. COZAD:  Objection; form.  You can answer.

12     THE WITNESS:  Any of his opinions in his

13   deposition are real similar to the ones that he

14   offered in his report, that he doesn't feel the

15   surface is slip resistant based solely on him

16   touching it with his hands.

17 BY MR. PUROW:

18   Q  Well, what I'm trying to get at is assuming

19 that he testifies, for example, that something is blue

20 in his deposition, are you gonna say, no, it's green?

21 Is there anything where you differ from anything he

22 states in his deposition apart from things that you

23 differed from him in his report?

24     MR. COZAD:  Objection; form.

25     THE WITNESS:  Yeah, at this point I don't know

1   that I can answer that specifically.  I didn't see

2   a lot of variation in his deposition testimony

3   versus his report.

4   BY MR. PUROW:

5   Q   Okay.  Okay.

6   A   Without specifically looking at a portion of

7   his deposition -- I mean, his deposition was I don't

8   remember how many pages at this point, but -- I didn't

9   see he offered anything new in terms of his opinion as

10  to why it is or isn't slip resistant.

11  Q   With regard to your conclusion, you state the

12  subject Wal-Mart parking lot and pavement markings were

13  in conformance with applicable codes with respect to

14  being slip resistant; how did you determine that?

15  A   We determined that by using the video and

16  doing an analysis that it was slip resistant based on

17  comparison of the analysis of published research.

18  Q   And you made that determination without

19  evaluating the paint or going to the scene, correct?

20  A   Couldn't evaluate the paint at the time of

21  Mr. Maribona's fall because it had changed and so going

22  to the scene seemed to be redundant.

23  Q   Okay.  You say there's no currently -- I'm

24  sorry, there's currently no mandated number or value

25  for minimum slip resistance by any Federal or State

1  codes, so are you indicating that any slip resistance

2  is acceptable?

3     A  No, I'm indicating that typically -- as we

4  stated in the report, people typically refer to

5  consensus standards that determine slip resistance of

6  surfaces using acceptable devices.  The code is not

7  going to say the slip resistance.  So far, the codes to

8  date require surfaces to be slip resistant.

9     Q  You say that Mr. Maribona's slip was due to

10  intrinsic factors; what does that mean?

11     A  So as we discussed earlier, there could be

12  multiple factors that contributed to his fall outside

13  of just the fact that he stepped on a painted stripe.

14  It could be factors associated with a contaminant,

15  factors associated with his shoes.  There's not a

16  pattern of incidence at that location because a

17  repeated pattern of incidences in the same location

18  would suggest in the environment versus something else

19  coming out.

20     Q  What regarding his shoes would make it more

21  slippery?

22     A  Well, if his shoe soles were worn, for

23  instance, or depending on what the shoe soles are made

24  with, they may be -- you know, some of the shoes, like

25  Crocs with those plastic rubber soles have a lower --

1 have a more slip resistant surface or less slip

2 resistant than say another type of tennis shoe sole or

3 one with a different type of tread.  We don't know

4 about his shoes, so it's purely speculation as to what

5 his shoes contributed.

6   Q  So are you saying that if his shoes

7 contributed, that for six months nobody was walking in

8 or out of the Wal-Mart with worn shoes?

9   A  No, that's not what I'm saying.

10   Q  Okay.  Well --

11   A  We just know that a shoe can be a factor.

12   Q  By the way, while you were doing your

13 statistical analysis for six months, did that only

14 include times when the ground was wet?

15   A  Yes.

16   Q  Okay.  And how is it you determine how many

17 people walked on that line when the ground was wet?

18   A  We just -- we made some -- we made -- we know

19 that in 100 -- it was six months, we just took it as

20 being 180 days, that encompasses the rainy season and

21 the dry season in this part of Florida and we did the

22 analysis on three different parameters -- or two

23 different parameters, so of that 180 days that it

24 rained on 90 of them.  Then we did another analysis

25 that was even more conservative and assumed that it

1  only rained on 30 out of 180 days.  The lowest number

2  that we got was a little over 1 in 1.3 million using 30

3  days and only 1,700 patrons a day.

4      Q   When is the rainy season?

5      A   Most typically it's from -- most typically it

6  starts around May or June and then goes through

7  September or October.

8      Q   Okay.  So for three months before this

9  incident this was not in the rainy season, correct?

10      A   Well, I mean, there's going to still be rain

11  associated with cold fronts, but it doesn't rain like

12  it does every day in the month of August, September,

13  October.

14      Q   Okay.  So why did you choose six months

15  instead of three months?

16      A   Well, six months is the period of time that we

17  have from the discovery materials that no one fell.

18  Then if we take Kamara's deposition, he's under the

19  impression it's been six years since there was a

20  similar incident.

21      Q   I mean, you would agree that the six months is

22  not when no one fell, but when nobody reported that

23  they fell, correct?

24      MR. COZAD:  Objection; form.

25      THE WITNESS:  Yeah.  We understand that

1    there's been no reported falls in the six months

2    prior to Mr. Maribona's fall.

3  BY MR. PUROW:

4    Q   Okay.  And again --

5    A   Then we reduce that six-month period to 90

6  days where it's potentially wet, and reduce it again to

7  30 to be conservative just to see where we are.

8    Q   Do you know how many times it rained in the

9  30 days before this incident?

10    A   I didn't say it was in the 30 days before.  We

11  assumed 30 out of the six months prior.

12    Q   Do you know how many times it rained in the 30

13  days prior to this incident?

14    A   I did not look and see how many times it

15  rained in the 30 days prior.  The analysis isn't based

16  on just the 30 days prior.  It's based on 30 days of

17  rain in a six-month period.

18    Q   Did you do any other investigation that we

19  haven't talked about in this matter?

20    A   To date, no.

21    Q   Do you have currently any plans to do any

22  further investigation in this matter?

23    A   Depends on what further discovery produces.

24  If there's any further discovery, we may do additional

25  analysis.

1   Q   But do you currently have any other plans to

2 do any further work?

3   A   As we sit here today, I currently don't have

4 any other plans.

5       MR. PUROW:  Okay.  Okay.  Thank you, sir.

6   That's all I have.

7                  CROSS-EXAMINATION

8 BY MR. COZAD:

9   Q   Good morning, Mr. Verlaan.  I've got just a

10 few.  Based on your review of the records, your

11 analysis and your experience, was this a safe walking

12 area where Mr. Maribona slipped?

13   A   Yes, it was safe.

14   Q   Did Wal-Mart do anything wrong to cause or

15 contribute to this slip?

16   A   No.

17   Q   And as part of your time spent in this case,

18 did it also include reviewing various depositions with

19 attachments?

20   A   Yes.

21   Q   And did Mr. Zimmerman use any testing or

22 scientific basis to support his opinions?

23   A   None that he provided in his report or

24 deposition testimony.

25       MR. COZAD:  That's all I have.  Thank you.

1               REDIRECT EXAMINATION

2  BY MR. PUROW:

3   Q   Sir, if Mr. Maribona did nothing wrong and

4  Wal-Mart did nothing wrong, then whose fault is that

5  Mr. Maribona slipped?

6   A   It would be no one's fault.

7   Q   It was an act of God?

8   A   It could be a random incident, slipped on a

9  random contaminant.

10    Q   Well, if someone slips, as a general rule is

11  it not true that either it's that person's fault or

12  there was a problem with the surface?

13      MR. COZAD:  Objection; form.

14      THE WITNESS:  I don't necessarily think that

15   you can assign fault or blame.

16  BY MR. PUROW:

17    Q   So if according to what you said, nobody

18  slipped after six months, would that mean that for six

19  months there were no random contaminants on the stop

20  bar?

21   A   None that would cause someone to slip.

22   Q   It just so happened that there was one there

23  when Mr. Maribona was walking there?

24   A   That's one possibility.

25   Q   And another possibility would be what?

1    A    Don't know.  I mean, his wife walks across the

2  stop bar immediately after him and doesn't slip.

3    Q    Now, other people on the video walked on the

4  stop bar, was there not a random contaminant there when

5  they walked there?

6        MR. COZAD:  Objection; form.

7        THE WITNESS:  You can't tell what there is or

8   isn't for random contaminants based on the

9   resolution of the video.  All you can tell is they

10    walked on the stop bar and did not slip.

11        MR. PUROW:  Okay.  Thank you, sir.  That's all

12   I have.  Do you read or waive?

13        THE WITNESS:  I'll read.

14        MR. PUROW:  Okay.  Sharon, I'll take a copy.

15   I'll order it.

16        THE COURT REPORTER:  Mr. Cozad, would like a

17   copy?

18        MR. COZAD:  Yes, please.  Thank you.

19        (Witness did not waive reading and signing.)

20        (Deposition concluded at 1:13 p.m.)

21

22

23

24

25

1       CERTIFICATE OF OATH

2

3 STATE OF FLORIDA

4 COUNTY OF LEE

5   I, Sharon Dutton, Registered Professional Reporter

6 and Notary Public, State of Florida, certify that

7 DERREK-IAN G. VERLAAN appeared before me via remote

8 video conference on the 22nd day of August, 2023, and

9 was duly sworn.

10    WITNESS my hand and official seal this 5th day of

11 September, 2023.

12       _____

            Sharon Dutton, Registered

13              Professional Reporter and

            Notary Public, State of

14              Florida at Large

15        MY COMMISSION: #HH038579

       EXPIRATION: JANUARY 1, 2025

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF REPORTER

2

3   STATE OF FLORIDA

4   COUNTY OF LEE

5          I, Sharon Dutton, Registered Professional

6   Reporter, do certify that I was authorized to and did

7   stenographically report the foregoing remote deposition

8   of DERREK-IAN G. VERLAAN; that a review of the

9   transcript was requested, and the foregoing transcript,

10  pages 4 through 68, is a true and accurate record of my

11  stenographic notes.

12         I FURTHER CERTIFY that I am not a relative,

13  employee, attorney, or counsel of any of the parties,

14  nor am I a relative or employee of any of the parties'

15  attorney or counsel connected with the action, nor am I

16  financially interested in the action.

17         Dated this 5th day of September, 2023.

18

19  _____

20         Sharon Dutton, Registered
           Professional Reporter

21

22

23

24

25

1      E R R A T A  S H E E T

2

3  DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
   IN RE:    WILFREDO MARIBONA VS. WAL-MART STORES EAST
4  CASE NO.:  2:22-CV-00244-JES-NPM
   DATE:      AUGUST 22, 2023
5  DEPONENT:  DERREK-IAN G. VERLAAN
   _____

6  PAGE  LINE     CORRECTION & REASON

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18  under penalties of perjury, I declare that I have
    read the foregoing document and that the facts stated
19  are true.

20
   _____
21  DATE               DERREK-IAN G. VERLAAN

22

23

24

25

1          WITNESS NOTIFICATION LETTER

2

3  SEPTEMBER 5, 2023

4

5  DERREK-IAN G. VERLAAN
     12750 Commonwealth Drive
6  Fort Myers, Florida  33913

7
     IN RE: WILFREDO MARIBONA VS. WAL-MART STORES EAST
8          Deposition taken on August 22, 2023
            U.S. Legal Support Job No.: 6405760
9

10  The transcript of the above proceedings is now
     available for your review.
11
     Please call U.S. Legal Support at 239-561-3526 between
12  the hours of 9:00 a.m. and 4:00 p.m., Monday through
     Friday, to make arrangements to read your transcript.
13
     Please complete your review within 30 business days.
14
     Sincerely,
15

16

17  Sharon Dutton, Registered Professional Reporter
     U.S. Legal Support, Inc.
18

19

20

21  CC via transcript:

22  Malcolm Purow, Esq.

23  Bartholomew Cozad, Esq.

24

25

## $

$7,494.96
  9:9

## -

--that's
  11:19

## 1

1
  52:2,3,4,5
  64:2
1,000,000
  52:4
1,700
  64:3
1.3
  64:2
10,000
  52:3
100
  52:4 63:19
10th
  13:3
11
  50:18,19,21
118
  28:18
12
  56:14
16
  50:18 51:3
180
  63:20,23
  64:1
1:13
  68:20

## 2

2.0
  34:12

2.501
  34:13
2.502
  34:13
2.901
  34:14
20
  52:3,5
200
  52:3
2007
  24:23
2015
  6:2,11
2018
  7:1
2019
  7:10
2022
  7:22 8:8
2023
  9:8 13:7
2023,0
  8:14
22
  29:17
22nd
  10:15 15:6,9
26
  6:1
27th
  15:15

## 3

30
  5:19 64:1,2
  65:7,9,10,
  11,12,15,16
36
  51:20
396
  51:20

## 4

4.5
  59:22
40/60
  9:2

## 5

50
  5:19

## 6

60/40
  9:2
66
  7:23 8:3

## 7

7
  30:14
70
  30:18
7th
  13:5 15:15

## 8

8th
  13:5

## 9

9
  50:18,22
  51:3
90
  63:24 65:5
925
  23:15
9th
  9:8

## 4

4.5
  59:22
40/60
  9:2

## A

able
  16:22 17:1
  21:13 22:3
  27:19,24
  48:2,4 57:3
  59:3
abrasive
  25:16
acceptable
  62:2,6
accessible
  59:22
accident
  5:11,15 13:1
accurate
  6:2,3
across
  28:21 43:25
  68:1
act
  67:7
actual
  59:8,19
adding
  31:15
additional
  65:24
additive
  27:2,8
additives
  25:11,14,16,
  19,22 26:3
administrative
  16:13
admissible
  56:3
aerial
  34:1,19
affect
  23:4 26:1
  27:5 46:12
affirm
  4:3

afternoon
14:6

agree
17:4 19:1
31:1 33:8
53:16,19
64:21

ahead
28:9 56:9

AIG
34:15

alert
35:10

allegation
7:17

allow
41:24

American
7:2,7

amount
5:17 19:5
44:3

analysis
5:9 18:13,
16,20 28:20
29:5,10
34:1,4,6,13,
14,16,25
43:14 47:13,
21 50:13
52:7,8
53:16,19,21
57:1,10
61:16,17
63:13,22,24
65:15,25
66:11

analyze
44:15

answer
9:22 12:21
19:16,25
27:10 35:21
55:24 56:18
57:16 60:11
61:1

answers
36:7

antifreeze
22:12

anybody
16:7,10 29:1
48:7

anyone
17:18 28:17
29:3 36:2
37:19 47:14

apart
60:22

apparently
47:12

appearance
25:17

appears
18:11,24
41:9 57:17

applicable
61:13

applied
10:6

apply
59:18,19

approved
31:16,17

arbitrarily
41:3

area
4:14,21 5:5
13:5 21:5
22:15 31:10
32:7,9,14
33:4,6
35:11,13
43:7 44:3
54:19 66:12

areas
4:23,24
31:23 41:19
43:12,13,16,
17,21,22
44:4,17
54:2,8,11,
12,15

around
5:19 15:6
34:22 64:6

article
18:4 19:4

asked
58:17

asking
19:18 20:7,
23 38:14,15

ASM
23:15

asphalt
24:16 42:1

assign
67:15

assignment
27:14,16

assistant
16:13

associated
7:19 62:14,
15 64:11

assume
5:24 27:1
32:24

assumed
63:25 65:11

assuming
32:22 60:18

Astoria
6:17,23

attachments
66:19

August
64:12

automatically
45:22

automobile
32:16

available
27:22,23
51:15,19
52:16 56:22

average
5:19

aware
23:19 25:10,
13 31:19,21
36:10 39:18
52:17 55:4

---

### B

back
10:24 29:11
37:23 48:6,
10 53:11

backwards
8:2

balances
10:7

bar
17:5 26:14
27:3,15
28:19,25
33:13,19
34:18,24
35:5,16,19
36:1 37:25
38:8 41:15,
17 42:19
43:7,12,15,
16,21,22,25
44:8,9,16,
17,20 52:25
53:2,5,22
58:4 67:20
68:2,4,10

bars
34:15,22
35:4

based
28:8 34:25
40:25 43:14,
23 45:3
50:13 52:7
53:22 55:15
58:17 60:15
61:16 65:15,
16 66:10
68:8

basically
4:16 21:11

27:11 35:1
46:9 51:13
56:20

**basis**
31:13,14
57:19 66:22

**beginning**
43:2

**behalf**
13:12,13,14

**believe**
7:14 9:14
17:12 30:14
43:9

**besides**
16:11

**better**
46:22 47:7

**billable**
10:8

**billings**
10:10

**bio**
11:20

**biodynamics**
11:20

**Black**
13:11

**blame**
67:15

**blue**
60:19

**boat**
7:15

**boats**
7:14

**body**
45:21

**Botman**
18:4

**bottom**
6:9 12:16
51:3,6

**Brandon**
7:10

**brushed**
24:16

**building**
59:17

---

### C

**Camp**
15:5,7

**carefully**
46:11

**cars**
22:12 54:11

**cart**
18:12

**case**
6:17,19,24
7:5,6,11,13
8:1,4,9,11,
17,18 14:1
27:5,14 42:3
66:17

**cases**
8:22 13:25
14:3

**caused**
42:6

**causing**
18:8

**center**
5:6

**certain**
25:10 29:12
43:12 50:11
54:11

**certification**
57:11

**CFP**
57:11

**change**
19:6,9 25:17
46:9 52:25
53:5

**changed**
16:5 23:7
61:21

**changes**
25:18

**chapters**
59:16

**check**
13:4 39:10,
21 40:5,8,
12,16,19
43:9 54:24

**checking**
41:3

**choose**
64:14

**Church**
8:15

**cite**
24:22

**cites**
59:16,22

**City**
6:10

**claims**
4:18

**cleaning**
7:15

**cleans**
7:14

**co-defendants**
8:5

**code**
27:18 57:21,
22 59:17,24
62:6

**codes**
57:18 59:11,
12,18 61:13
62:1,7

**coefficient**
19:8 23:3,6,
11,16 24:3,
8,19 25:6
26:20 27:5
29:12,14,15
51:13,15,18,
19,20

**cold**
64:11

**Collier**
57:21

**color**
32:1

**come**
9:3 11:10
41:25

**commenting**
55:25

**company**
7:7

**compare**
20:7

**comparing**
48:15

**comparison**
24:17 48:20,
23 61:17

**compliance**
57:20

**concern**
31:9

**concluded**
68:20

**conclusion**
55:22 61:11

**conclusions**
55:18 56:12

**concrete**
24:16

**condition**
6:14 53:4,
12,14 54:2

**conditions**
23:9 39:12
52:25

**conduct**
13:3 56:20

**confirmed**
23:22

**conflict**
13:4

**conformance**
27:18 61:13

**confused**
30:24

**consensus**
62:5

conservative
 63:25 65:7
consider
 11:5,7
consist
 14:17
consisted
 10:22
consistent
 48:1
constant
 21:25 22:2
constantly
 22:1 32:17
construction
 5:2 8:11
 57:8
consultant
 4:20
consulting
 4:17,21 5:3,
 7,11,15
contact
 11:10
contacted
 12:25
contained
 14:18
contaminant
 12:11 21:22,
 23,25 22:3,
 4,6,15 23:1
 44:13 62:14
 67:9 68:4
contaminants
 11:13 22:23
 32:10 41:25
 42:7 44:3
 67:19 68:8
continuously
 22:13
contribute
 11:2 12:19
 18:20 19:2
 66:15
contributed
 62:12 63:5,7

contributing
 17:9
contribution
 11:24
cooling
 8:3
copy
 68:14,17
correct
 5:21 6:18
 9:12 13:7
 15:17 17:5,
 6,22 18:4,8,
 14 21:6,7
 22:20,21
 28:6,7 29:1
 32:4,20,21
 33:11 35:14,
 16,17,20
 37:1,3,13
 38:1,9,18,23
 39:5,12,22
 40:13 41:5,
 12,13,15
 42:7,22
 44:10,18
 46:13,16,20,
 23 49:19
 50:6 51:1
 52:20 53:17
 54:2,12,13,
 15,16 55:6,
 14 61:19
 64:9,23
correlate
 47:3,13 48:4
correlates
 28:1
correspondenc
 e
 15:1,20
Costello
 8:14
Council
 6:10
counted
 43:10

counting
 28:14
County
 57:21
couple
 60:1
court
 4:2 6:4,7
 16:16 23:18
 68:16
cover
 16:15
covered
 56:13 57:7
Cozad
 9:6,15,18,22
 10:17 12:21
 13:11,15,16
 14:7,9
 19:16,25
 24:5 26:4,21
 27:6,21
 29:2,18
 30:18 31:3,
 12 32:8
 35:21,25
 36:14 37:2,
 7,14 38:2,
 10,19,24
 39:6,23
 40:6,14,20
 41:21 43:18
 44:5,11,19
 46:2,24
 47:10 48:9,
 18 49:20
 52:21 53:6,
 18 54:3,20
 55:1,7,20,23
 56:6,9,17
 57:16 58:15,
 17,22 60:4,
 11,24 64:24
 66:8,25
 67:13 68:6,
 16,18
cracked
 42:9,10

cracks
 41:5,7,9,11,
 14,18,23
 42:7,12,14,
 22
Crocs
 62:25
cross
 53:24
CROSS-
EXAMINATION
 66:7
crossing
 35:11 43:14
 56:7
crosswalk
 35:4
cut
 28:9
CV
 4:25 5:2

---

**D**

---

damage
 4:19 5:4
date
 9:10,12,13
 10:1,8,22
 15:19 62:8
 65:20
dated
 9:8
day
 10:17 48:6,
 11 53:12
 64:3,12
days
 63:20,23
 64:1,3 65:6,
 9,10,13,15,
 16
deal
 22:4
decreased
 45:8

decreases
29:13,16
defect
8:11
defendant
6:25 8:24
defendant's
36:7
defendants
6:24
define
24:11 31:24
32:2,4
35:22,24
49:8
defines
45:2
degree
57:8,12,13
degrees
57:5
depending
9:3 25:8,24
32:14 62:23
depends
25:20 45:20
49:8 65:23
depicts
17:6
depo
36:23
deposition
6:16 7:1,22
10:11,25
15:5,8,22
17:20 36:9
46:21 60:3,
6,10,13,20,
22 61:2,7
64:18 66:24
68:20
depositions
5:20 6:1
66:18
Derrek
4:13

DERREK-IAN
4:6
Derrevere
13:11,16,17
description
18:15,16
determination
29:9 61:18
determine
12:6 16:22
17:1 27:15,
17,19 28:20,
24 33:25
45:7 47:22,
24 48:2,5,
14,16 57:1
59:7 61:14
62:5 63:16
determined
18:6 49:10
61:15
determining
11:5 18:21
21:11 36:18
39:25
develop
41:11
developed
40:5
development
6:13
device
23:14,17,21,
24
devices
62:6
DGV
5:24
diagrams
18:2,3
differ
60:21
differed
60:23
difference
11:22 19:13
20:17 21:2,

20 24:3,8,
18,19 26:19
43:24 44:2
45:16
differences
21:3 45:13,
15
different
20:8,11,19,
22,23 24:15
28:13 34:6
43:15,16,21
44:4,8 56:3
63:3,22,23
differentiate
59:3
dimension
35:2
DIRECT
4:9
directly
19:23
disagree
56:11,16
57:14 58:8
59:9,14
60:3,5,9
discovery
36:6,8 64:17
65:23,24
discussed
62:11
discussion
31:5
disqualified
6:6 23:18
distance
34:14,16
35:3
diver
7:14
document
5:23 9:4
29:25 30:2,
10,11,24
31:6 36:7
50:18,22,24

documentation
30:7 31:15
documented
8:6
documents
14:7,8,16
15:3,7
doing
5:18 6:12
17:15 57:10
61:16 63:12
dripping
32:17
drive
22:12 54:11
dry
45:23 63:21
drywall
5:4
due
39:11 62:9
duly
4:7
dynamic
23:15

---

E

e-mail
15:21
earlier
42:16 62:11
Eddy
6:17
effect
45:14 54:14
effectively
22:4
effectiveness
26:2
Effects
24:24
egress
59:16
either
67:11

elderly
    19:5
electrical
    7:20,21
elements
    11:1,3
employment
    5:14
encompasses
    63:20
encounter
    12:11,12
end
    10:16 43:3
enforcement
    57:21,22
engaged
    16:5
engineering
    11:20
ensure
    35:19 38:17
    41:18
entail
    10:12,19
enter
    28:22 53:24
entire
    31:25 33:4,
    10,20 43:2
    53:20
entitled
    5:23
environment
    62:18
environmental
    4:20 6:14
    26:7 39:12
    42:15,16
equal
    21:19
errors
    24:1,2
ESI
    9:5
establish
    27:24 34:8

established
    27:25
Estate
    7:10,23
evaluate
    61:20
evaluating
    12:3 61:19
event
    18:6
everyone
    22:3 53:23
everything's
    14:13
evidence
    22:17,22
exactly
    20:20
EXAMINATION
    4:9 67:1
examined
    4:7
examples
    20:14,15,21
    22:10
exceeds
    50:15
excuse
    24:4
Exhibit
    30:14
existed
    53:14
expect
    35:12,15
    37:6,22,24
    42:19,21
experience
    66:11
expert
    14:22 25:9
    55:24
expert's
    55:25
expertise
    4:15

explain
    47:14 51:10
explanation
    51:13
extent
    11:23 44:12

## F

fact
    21:4,12
    31:21 49:3,
    17 62:13
factor
    19:7 42:4
    63:11
factors
    11:5,7 12:6,
    8,18 26:1,7
    32:15 42:16
    62:10,12,14,
    15
failed
    58:1
fair
    15:16
fall
    5:8 11:2,6,
    24 37:5
    49:2,5,13
    52:10 53:3
    54:18 57:4
    61:21 62:12
    65:2
fall-related
    13:23
falling
    45:3,8 46:13
    48:25 49:13
    50:12,14
    51:8,21
falls
    8:23 13:21
    39:21 49:3,
    10,17 54:18
    65:1

far
    28:13 36:22
    52:12 53:2
    62:7
fashions
    20:15
fault
    67:4,6,11,15
Federal
    61:25
feel
    45:13 46:4
    47:8,12 49:1
    60:14
feeling
    45:1,3,6,9
    47:6,23
    48:1,8,14
feels
    47:4
feet
    19:23 34:19,
    22 35:2
fell
    8:2,18 40:11
    64:17,22,23
figure
    15:21
file
    10:23,24
    14:12,18
    15:1 17:19
    34:6,7,11
film
    45:24
find
    24:18 30:16
    57:22
findings
    60:10
fire
    4:20 5:4
firm
    13:15
first
    8:15 12:25
    14:1 15:2

fit
  33:20
five
  18:5 30:8
flipflops
  12:13
Florida
  59:16 63:21
focus
  4:22 5:2
follows
  4:8
foot
  18:7 33:2,4,
  10,14,20,24
footsteps
  28:8 50:14
  52:9
footwear
  11:12 12:13
forced
  51:18
form
  9:15,18
  12:21 19:16,
  25 26:4,21
  27:6,21
  29:2,18
  31:3,12 32:8
  35:21,25
  36:14 37:2,
  7,14 38:2,
  10,19,24
  39:6,23
  40:6,14,20
  41:21 43:18
  44:5,11,19
  46:2,24
  47:10 48:9,
  18 49:20
  52:21 53:6,
  18 54:3,20
  55:1,7,20
  56:17 57:16
  58:15,16,22
  60:4,11,24
  64:24 67:13
  68:6

Fort
  6:10
forward
  18:7
found
  24:18
four
  13:20 30:25
fourth
  10:17
free
  54:18
friction
  19:6,9 23:16
  24:20 29:13,
  14,15 51:9,
  14,15,16,19,
  20
front
  17:5 33:19
fronts
  64:11
full
  18:10 24:25
function
  18:19

G

gait
  11:15,17,19,
  21,24 18:13,
  16 19:1,7
gaits
  20:9,12,18,
  22,23
Gathering
  14:11
gave
  6:16 7:1,22
  52:8
general
  11:4 18:15,
  16 67:10
generally
  18:18 58:24

generated
  10:13,15
gentleman
  7:13
give
  4:3 22:10
given
  5:20 6:2 9:2
God
  67:7
goes
  64:6
going
  10:24 11:10
  12:10 14:15
  21:20 25:20
  28:11,21
  30:16 31:19
  37:23 53:8
  61:19,21
  62:7 64:10
good
  4:11 12:15
  66:9
gravelly
  45:11
green
  60:20
ground
  22:20 31:10
  63:14,17

H

H-E-J-Z-L-A-R
  16:20
half
  34:23 55:14,
  16
hand
  45:4,10,18,
  20,21 46:1,
  19 47:4,14,
  24 48:1 49:2
hands
  60:16

happen
  42:3
happened
  18:21 42:4
  67:22
Hawks
  13:11,16
hazard
  40:2,5,8
  48:25 49:7,8
hazards
  39:25 40:1
hear
  11:16 16:24
hearing
  6:10
heel
  18:18,25
Hejzlar
  16:20
help
  15:14 25:23
holding
  32:10
homeowner
  7:7
Homes
  8:9
horizontally
  33:16
hours
  10:12 22:1
  29:17 43:6
hunt
  15:20
hurricane
  4:19
hurricanes
  5:17

I

ice
  45:18,22,23
  46:1,4,5,6

idea
  36:24 46:22
  47:7
identify
  22:25
immediately
  68:2
impossible
  48:7
impression
  64:19
improve
  25:23
inappropriate
  56:1
inaudible
  16:14
incidence
  62:16
incidences
  36:2 62:17
incident
  26:15 27:25
  28:1,4,7
  33:9 34:8
  64:9,20
  65:9,13 67:8
incidents
  36:8,11,12
include
  38:22 39:4
  63:14 66:18
included
  24:15
incorrect
  55:19,21
  58:3
increase
  22:7
increased
  45:8
increases
  29:14,15
indicate
  17:15 21:14
  31:22 57:19

indicated
  16:14 22:19
indicating
  62:1,3
indication
  38:25 44:1
  49:13
indications
  38:11
individual
  11:15,17
individually
  14:16
information
  27:23 41:1
  43:23 52:16,
  22
initially
  36:21,23
initials
  5:25
inner-
laboratory
  23:23
inordinate
  5:17
inside
  59:18
inspect
  55:11,12
inspecting
  58:13,20
  59:2
inspection
  8:6
instance
  21:10 62:23
instruct
  55:23
insurance
  4:18 7:2,7
Integrity
  7:2,8
intended
  6:15
interest
  5:5

interrupt
  16:16
intrinsic
  62:10
introduction
  5:6 22:5
investigating
  36:11
investigation
  4:20 5:12,15
  29:8 39:19
  65:18,22
invoice
  9:5,6,8,11,
  12,25 10:3,
  9,18,22
involved
  8:23 14:8,10
  33:9
involves
  5:15 39:25
irrelevant
  44:18,23
issue
  21:14 37:21
  39:15,18
  49:11 54:4
  55:4
issues
  5:3 7:19
  19:10 37:22
  40:25
item
  5:12

**J**

Jerome
  7:23
job
  36:10
John
  13:17
June
  9:8 64:6

**K**

Kamara
  36:9,23
Kamara's
  64:18
Kemp
  7:11,16
kind
  6:19 7:5,11
  8:1,9,17
  11:4 18:17
  51:12 56:6
know
  10:10,12
  12:22 14:7,
  15 17:13
  20:1,13
  22:18 23:17,
  20 25:9
  26:13,14,24
  27:10 28:11
  31:4,13,14
  32:15 34:23
  35:2 36:5,
  17,19,22,25
  37:8,12,15,
  16 38:3
  39:14 40:22
  42:8,10,20
  44:22 45:14
  46:5 47:11
  48:24 50:24
  52:12,19
  53:2,12,13
  54:8 55:9,24
  60:25 62:24
  63:3,11,18
  65:8,12 68:1
knowing
  27:7,8
knowledge
  14:16
known
  51:18

## L

lack
21:22

large
14:7 31:22
32:6,14 33:3

larger
32:9 51:11

lasts
26:2

law
13:15

lead
51:12

leading
10:11 18:7

Legacy
8:9

length
27:3

letter
13:2,3

levels
29:12

liability
5:8 7:18

life
59:17

likelihood
19:22 23:4
46:13

line
5:12 51:22,
24,25 52:1,5
56:7 63:17

lines
34:17 35:7,9

list
10:13 25:4
34:14

literally
47:23

literature
29:21,23

litigation
7:8

Litsy
8:14,18,21

little
15:6 24:18
45:24 51:11
64:2

location
21:18 36:25
62:16,17

long
15:5,7 26:1
42:25 43:4
53:12,13

longer
21:1

look
11:18,20
12:1 13:2
15:1 16:6
28:25 29:3,
23 30:13
34:15 47:12,
17,19,21
65:14

looked
28:16 30:23

looking
4:25 11:22
15:12,19
18:23,24
21:10 25:2,3
34:16 35:1
50:20,21,25
51:5 58:6
61:6

looks
19:4 30:18

loses
26:2

loss
4:17 5:3
7:6,8,9

lot
5:18 19:7
22:13 24:12

litigation
32:16,19
51:16 53:20
54:9 55:13
59:19 61:2,
12

lots
31:18

Louisiana
7:24

lower
62:25

lowest
64:1

## M

machine
24:1

machine-
related
24:2

made
61:18 62:23
63:18

main
11:14

maintain
55:3

maintenance
7:19 40:23

make
14:13 25:11
26:19 27:2
37:25 38:7
39:4 41:14,
19 49:7
51:11 54:19
62:20

makes
18:25

making
29:8

Malcolm
55:24

managing
5:7

mandated
61:24

manner
8:21

Maribona
16:22 17:1,8
18:10 23:9
36:20 43:8
52:13,16
53:13 66:12
67:3,5,23

Maribona's
18:21 27:4
42:3,6,9
61:21 62:9
65:2

marina
7:11,15,21

marking
28:17 31:17
32:21

markings
57:23 61:12

materials
10:25 64:17

math
57:6

matter
16:6,11,12,
13 65:19,22

matters
13:23

Matthews
7:23 8:2

mean
18:23 20:1,
5,25 26:6
32:21 33:6
37:5 48:19
49:14,18,24
50:1,3,7,8
55:21 59:8
60:5 61:7
62:10 64:10,
21 67:18
68:1

Meaning
  10:21 20:20
  22:18
means
  22:5 49:15,
  21 50:4
measured
  34:21
measures
  23:15 34:18
medical
  11:25
melt
  45:22
meter
  23:15
Methodist
  8:15
microscope
  59:7
mid
  10:18
million
  50:12,15
  51:21 52:1,9
  64:2
minimum
  61:25
misstates
  59:10
misstating
  40:22
mitigate
  40:2 41:23,
  24
mitigating
  40:1
mitigation
  39:24
mold
  5:3
month
  10:16 64:12
months
  36:3,9
  37:12,17
  42:11 52:8,

12,18 53:1,
5,8,11 63:7,
13,19 64:8,
14,15,16,21
65:1,11
67:18,19
morning
  4:11 66:9
move
  28:12
moving
  20:13
multiple
  12:8 23:23,
  24 33:7
  37:22 62:12
Myers
  6:10

---

**N**

name
  4:12,13
  16:19
Naples
  6:17,23
narrow
  33:1
necessarily
  13:22 39:13
  44:22 46:25
  67:14
necessary
  35:18 37:25
  38:7,16
  47:12
need
  39:19,20
  40:19 59:7
needs
  53:24
negligence
  7:17
negligent
  17:8,12
negotiate
  21:13

newer
  12:15
nine
  51:5
nonpainted
  33:3
nonporous
  58:5,14,21
notice
  40:7,11
notified
  54:24
number
  14:7 21:5
  22:12 28:5,
  14 32:15
  42:15 50:4,
  21 61:24
  64:1
numbers
  51:3

---

**O**

objected
  9:18
Objection
  9:15 12:21
  19:16,25
  26:4,21
  27:6,21
  29:2,18
  31:3,12 32:8
  35:21,25
  36:14 37:2,
  7,14 38:2,
  10,19,24
  39:6,23
  40:6,14,20
  41:21 43:18
  44:5,11,19
  46:2,24
  47:10 48:9,
  18 49:20
  52:21 53:6,
  18 54:3,20
  55:1,7,20

56:17 57:16
58:15,22
60:4,11,24
64:24 67:13
68:6
obligation
  54:23
observations
  58:18
observed
  20:24
occupational
  5:9
occurs
  12:3
October
  64:7,13
offered
  60:14 61:9
offering
  29:20
office
  16:7,10
official
  16:18
oil
  22:11 23:1
Okay
  4:25 5:10,
  14,20 6:9,
  16,22,24
  7:10,22 8:8,
  14,22 9:7,20
  10:5 11:1
  15:18 16:1
  17:16 18:13
  20:8 21:16
  23:10 25:14
  27:1 30:7
  31:9 32:5,19
  33:25 34:17
  37:11,19
  40:18 42:5
  43:6 44:15
  47:6 48:6
  51:5,10 52:5
  56:15 57:5,

14,25 58:3,8
59:5 60:2
61:5,23
63:10,16
64:8,14 65:4
66:5 68:11,
14
once
29:12 50:11
one
4:23 8:5
9:16 12:6,19
15:6 19:10
21:8,17
22:2,15 30:1
33:24 34:15
36:2,7
37:15,16
40:11 42:4,5
44:3 45:12
49:6,12
50:12,15
51:7,21
52:1,8,9,13
54:18 55:16,
24 63:3
64:17,22
67:22,24
one's
67:6
one-page
30:1
ones
11:14 12:23
60:13
online
57:21
open
18:1
opening
13:2,3
opines
58:1
opinion
17:7,11
41:14 56:21
57:19 61:9

opinions
55:25 60:1,
9,12 66:22
opportunity
47:20
opposed
8:24 12:19
19:15,23
32:7 33:3
45:11
order
25:11 28:24
68:15
original
37:23
outdoor
8:19
outside
26:6 59:20
62:12
owner
6:12 7:9

---

**P**

---

P-A-N-D-O
7:3
p.m.
68:20
page
17:25 18:14,
16 30:18
50:17,18,21,
22 51:1,3,5
56:14
pages
30:8,9,22,25
61:8
paid
9:13,25 10:3
paint
25:5,9,18,
24,25 26:1,
6,11,13,20
27:1,5,20
29:24 31:1,
6,10,15,17,

22,25 32:5,
6,11,17,22,
25 33:5,15,
16,17 38:23,
25 39:5,10,
11,19 41:3,
5,6,10 54:5,
6,24 55:3,4
58:4 61:19,
20
painted
21:11,13
24:10,17,20
26:14 27:4
28:22 33:4,
6,10,12,21
40:24 41:19
42:20,21,24
44:20,21
45:11 46:19
50:14 53:21,
23 54:1,8,
15,19 58:13,
20 62:13
painting
24:24 31:9
40:25
paints
25:11,21
Palm
7:11
Pando
7:2
parameters
63:22,23
parking
22:13 24:12
31:18,25
32:15,19
33:1,8 53:20
54:9 55:13
59:19 61:12
part
19:5 27:14,
16 34:5 57:8
63:21 66:17
partial
10:2 28:17

partially
10:4 18:11
particular
8:4 21:10
22:4 23:14
26:10 27:20
51:17
parts
44:8,9
party
6:22
passed
7:15
patron
34:13 50:14
patrons
64:3
pattern
53:8 62:16,
17
pavement
24:9,11,15
57:23 61:12
payment
10:2
PDF
50:17,19,20,
23
peck
15:20
pedestrian
31:23 35:11
pedestrians
22:14 31:11
35:12,15,19
38:1,8,18
people
12:4,5,11
18:17,18,19
19:5 20:13,
15,18,22,25
21:1,5,13
23:23,24
28:5,6,14,
18,21 29:11,
14 31:19
36:24 43:6,

14,25 44:15,
16 46:4
48:25 49:1
50:4 51:16
52:11,14,19
53:22 62:4
63:17 68:3
percent
5:19
percentage
5:14 8:22
28:8
period
42:25 43:4
49:18 52:7
53:3 64:16
65:5,17
periodic
39:16 55:2
periodically
39:10 40:22
42:17 55:12
Perpendicular
33:15,17
person
11:22 12:6,
7,10,14,19
21:8,9,17,18
36:2 49:6,13
52:17
person's
12:13 21:21
67:11
Pertaining
10:20
pertains
57:10
ph
8:14
Phillips
7:23 8:3
photograph
34:1,19
photographs
8:7 34:22
photos
41:8 58:6

physical
29:10
physically
28:19
pick
22:14
placing
19:23
plaintiff
8:24
planar
35:1
plans
65:21 66:1,4
plant
8:3
plastic
62:25
plates
51:18
please
4:12 68:18
point
44:1 60:25
61:8
porosity
59:8
porous
59:6
portion
17:23 31:5
43:25 57:9,
10 59:24
61:6
possibility
67:24,25
possible
38:8,17 39:4
potential
11:13
potentially
65:6
practice
8:25
preemptive
40:12

premises
5:8
preparation
10:11,25
14:8
prescriptive
18:17
presence
11:13 21:21
presented
58:5
primarily
14:21
primary
4:14,16,21
5:5 12:23
prior
9:9 12:12
13:14 18:14,
15 26:18
43:10 52:13,
18 53:3
65:2,11,13,
15,16
probably
5:16,17 8:25
10:14,16,18
21:20 22:6
25:4 53:9
problem
67:12
produced
29:25
produces
65:23
product
34:6,7,9,12
production
10:24 14:12
15:2 26:16
30:1,17
34:11 41:1
products
30:12
professional
11:25

program
40:23
project
6:13
projects
5:7
proof
49:12,15,16
properties
25:18 27:9
41:16
property
4:17 5:3
6:12 7:6,9
prosthetic
19:10
provide
41:16 57:18
58:1
provided
5:23 9:5
14:6,9,17,23
29:23 52:23
66:23
provides
58:13
public
6:10 28:2
published
25:1 28:7
29:11 45:2
47:4 48:4,7,
15,16 50:10
61:17
pull
9:7 57:18
purely
63:4
PUROW
4:10 9:23,24
12:24 16:21
19:19 20:3
24:6,7 26:9,
25 27:13
28:3 29:6,22
30:21 31:8,
20 32:12

35:23 36:4,
16 37:4,10,
18 38:5,13,
21 39:2,8
40:3,9,17
41:4 42:2
43:20 44:7,
14,24 46:7
47:1,16
48:12,21
49:23 52:24
53:10,25
54:7,22
55:5,10
56:2,8,10,24
57:24 58:16,
19 59:1
60:8,17 61:4
65:3 66:5
67:2,16
68:11,14
purpose
35:6,9
put
33:14

**Q**

question
9:19,21 11:4
21:16 23:10
26:15 28:10
37:23 38:6,
15 39:3
52:14 53:4

**R**

rain
64:10,11
65:17
rained
63:24 64:1
65:8,12,15
rainy
63:20 64:4,9

ran
46:19
random
67:8,9,19
68:4,8
rate
27:11,25
28:1,4,7
34:8
reach
50:11
read
51:12 58:10
68:12,13
reading
68:19
real
43:24 44:2
60:13
rear
18:7
reason
40:16
reasonable
32:24
rebuttal
14:21
recall
13:19 30:23
received
10:2 15:7,9,
12,25
recently
5:18 25:3
42:20,21
recollection
6:20
records
57:21 66:10
recoveries
28:18
redevelop
6:15
REDIRECT
67:1
reduce
65:5,6

redundant
61:22
refer
17:21 62:4
reference
25:4 34:14
referring
11:3 17:23
reflecting
41:9
regard
18:21 29:24
56:15 61:11
regarding
8:23 12:25
62:20
related
5:8
relation
6:11
relative
11:23
relevant
48:20,23
reliability
23:20,22
relied
47:23 53:17,
20
remember
8:4 61:8
repaint
39:17 42:17
55:12
repainted
46:16,18
53:3 54:10
repainting
39:16 55:2
repeat
9:20 19:17
28:10
repeated
62:17
report
10:24 14:23
15:10,12

16:14,15
17:21,23
18:1,10 21:4
29:20 30:15
34:4 36:20,
22 37:6,9
43:9 50:25
51:1,2,12
56:14,16
57:15 58:9,
11 59:15
60:14,23
61:3 62:4
66:23
reported
36:12,25
37:16,22
55:6 64:22
65:1
REPORTER
4:2 16:16
68:16
reporting
36:19
reports
55:8
represent
6:22 8:12,
20,21,24
representativ
e
23:8
represented
6:12,23 7:9,
16
representing
8:5
require
19:6 62:8
required
19:8
requiring
59:11
research
5:9 19:3,8
24:14 26:10
27:20 28:2,8

29:11,19
45:2 47:5
48:5,7,15,16
50:11,16
61:17
resistance
22:7 25:24
28:2 39:11
50:11 54:14
61:25 62:1,
5,7
resistant
21:12,14
27:17 38:22
39:1,5
47:23,25
49:12,14,22
50:5 54:5
56:23 57:2
58:2 59:12,
24,25 60:15
61:10,14,16
62:8 63:1,2
resolution
22:24 68:9
respect
4:18 11:21
17:19 51:8
58:4 61:13
responsibilit
y
38:7,16 39:9
40:4
restates
59:25
restricted
32:19
retained
13:8,9
14:20,21
56:8
retainer
10:3,4,7
retention
8:3
review
14:12 26:16

29:21 30:3,
5,8,22 66:10
reviewed
15:22 16:14,
17 57:20
reviewing
10:23,24
66:18
right
19:20 22:19
33:8 42:23
51:4
risk
29:13,15
39:24 45:3,8
50:12,14
51:8,20 52:9
rotation
55:17
roughly
34:19,23
routes
59:23
routine
40:23
Royal
7:11
rubber
62:25
rule
6:1 67:10
run
45:10,18,25

———————

**S**

S-T-R-E-I-T
8:9
safe
35:19,22,24
37:25 38:8,
12,14,15,17
39:4,21
40:13 54:19
66:11,13
safety
4:17,21 5:7,

9,11,15
57:10 59:17
saying
19:21 28:5
33:18 39:20
40:18,21
45:5,25
47:6,17,19
48:13 49:9
54:17,21
63:6,9
says
5:7 31:6
59:25
scene
16:1,2,5,8
46:15 61:19,
22
schedule
39:16 55:3,
15
scientific
66:22
screen
51:12
season
63:20,21
64:4,9
second
5:12
section
34:10 58:10
sections
59:18
see
10:16,18
15:2,6 17:14
20:25 22:12,
17,22 23:25
27:11 28:16
29:1,3
39:10,21
40:5,13
42:21 61:1,9
65:7,14
seeing
45:16

September
10:17,18
64:7,12
set
15:2
seven
18:5 52:9
several
59:10
severe
19:10
Sharon
68:14
Sherwin
29:24 30:8
shoe
11:12 12:16,
17 21:21
22:15 62:22,
23 63:2,11
shoes
62:15,20,24
63:4,5,6,8
shorter
21:1
show
18:17
showed
24:14
shows
6:1 9:9 19:8
22:19 29:11
side
19:11 20:14
significant
19:13,21
24:19 44:2
signing
68:19
similar
18:9 60:13
64:20
sir
4:11,14 5:1,
22,25 6:25
11:1 13:7
14:19 66:5

67:3 68:11

Siri
  24:4
sit
  13:19 66:3
site
  6:14 8:6,7
situations
  12:2
six-month
  53:3 65:5,17
slide
  19:15,22
  20:2,4,6
slides
  18:7
slightly
  35:4
slip
  5:8 6:20
  8:23 11:2,6
  12:3,4,5
  13:21 17:9,
  17 18:6,22,
  24 19:2
  21:6,8,9,12,
  14,17,18
  22:7 23:3,4,
  6,11,15
  24:3,8 25:6,
  24 26:19
  27:4,5,17
  28:2,15,17
  37:16 38:22
  39:1,5,10
  42:6,9
  47:22,24
  49:11,12,14,
  15,16,21
  50:4,5,11
  54:5,14
  56:23 57:2
  58:2 59:11,
  23,25 60:15
  61:10,14,16,
  25 62:1,5,7,
  8,9 63:1
  66:15 67:21

slipped
  16:23 17:2,4
  28:6 29:1,4
  36:24 37:5,
  11,20 40:11,
  19 47:15
  52:11,15,17,
  19 53:13
  54:25 66:12
  67:5,8,18
slippery
  19:12,20
  25:12 27:2,
  15 28:25
  31:1,7 32:6
  41:15,20
  43:13,17,22
  44:9,25
  45:6,12,19,
  23 46:1,23
  47:5,8 48:3,
  8,14,17,24
  49:3,4,19
  62:21
slipping
  12:19 19:22
  29:13,16
  36:3 40:15
  44:16 46:6
slips
  12:6,11
  13:22 17:22
  28:17 67:10
slowly
  46:10
small
  15:6 22:25
  23:1 32:7
smooth
  12:14 24:16
  58:5,7,13,
  21,25 59:4
sole
  12:14 63:2
solely
  60:15

solemnly
  4:2
soles
  12:16 62:22,
  23,25
solid
  32:1
somebody's
  19:1 33:10,
  20
someone's
  11:18,24
  58:18
speaking
  58:23,24
specializatio
n
  5:13
specific
  15:19 59:18
specifically
  8:25 11:18
  13:15 17:3
  61:1,6
speculate
  58:17
speculation
  63:4
spent
  5:18 66:17
spikes
  12:15,16
split
  18:8,10
spoken
  17:16,18
spot
  22:25 23:1
stairs
  6:21
stall
  31:25 32:16
stalls
  32:20 33:1
standards
  62:5

start
  45:22
starting
  18:24 56:14
starts
  45:23 64:6
state
  56:19 61:11,
  25
stated
  62:4
statement
  37:12
states
  46:21 58:5
  60:22
statistical
  28:20 29:4
  47:21 50:13
  52:7 57:1
  63:13
statistically
  24:19
statistics
  57:5,7,9,13
step
  19:15,23
  20:2,4,6
  33:2,10
  34:13,14
stepped
  28:19 33:16
  43:7,8,10
  62:13
steps
  19:14 28:21,
  22 33:7
  35:18 37:24
  38:7,16
Steven
  8:8
stills
  34:15
stop
  17:5 26:14
  27:3,15
  28:19,25

33:9,13,19
34:15,18,22,
24 35:3,5,
16,19 36:1
37:25 38:8
41:15,17
42:19 43:7,
12,15,16,21,
22,25 44:8,
9,16,17,20
52:25 53:2,
5,22 54:1
58:4 67:19
68:2,4,10
store
  28:23 33:13,
  19 35:18
  53:24 57:19
straight
  19:14,23
strategy
  39:24
Streit
  8:8,13
strides
  21:1
strike
  18:18,25
  26:13
stripe
  21:12,13
  32:25 62:13
stripes
  28:22 33:12,
  18,23 40:24
  50:15 53:21,
  23
structural
  5:3
structure
  59:19,20
studies
  23:23 57:9
study
  24:14,23
  42:11 50:17
  51:17

stuff
  32:17
stumble
  6:21
subject
  26:6 31:23
  32:10 54:2
  61:12
suggest
  62:18
sun
  26:7 42:16
support
  56:21 66:22
supported
  18:11
sure
  4:13 12:2
  14:13 15:4
  26:5 33:12
  37:25 38:7,
  20 41:1
  51:11 54:19
surface
  11:8,10,11,
  14 12:3,4,5
  19:13,21
  21:15,21
  22:2 23:3,7,
  25 25:17
  32:11,17
  33:3,5,7,10,
  21 41:10,25
  42:8 45:3,8,
  11,14,22
  46:4,19
  47:7,9,22
  48:2,17
  49:11,18,21
  56:23 57:2,3
  58:2,5,6,13,
  14,20,21,24
  60:15 63:1
  67:12
surfaces
  24:15,17,20,
  21,25 25:21
  44:21 45:15

49:12,15
  51:14 59:25
  62:6,8
swear
  4:2
sword
  41:23
sworn
  4:7
system
  7:20,21
systemic
  37:21

---

T

table
  51:7,10 52:2
tactile
  45:13
take
  20:4 35:18
  37:24 38:7,
  16 64:18
  68:14
taken
  35:2
taking
  24:15 28:21
  33:7
talk
  21:4
talked
  42:16 65:19
talking
  21:24 24:4
  30:10,11
tank
  8:3
Technology
  24:5
tell
  4:11 11:1
  37:19 42:5
  44:25 45:5,
  12,18,25
  46:3 48:8

58:12,20,25
  68:7,9
temperature
  45:20,21
tennis
  63:2
term
  59:13,23
terms
  31:25 48:24
  61:9
test
  23:6,10 25:5
  27:11 47:14
  57:3
testified
  4:7 6:4
testifies
  60:19
testifying
  6:10
testimony
  4:3 6:6,13
  17:20 61:2
  66:24
testing
  23:8,17,20
  26:22,23
  45:17 56:21
  66:21
Thank
  66:5,25
  68:11,18
there'd
  12:8 40:15
thereof
  21:22
thing
  4:19
things
  12:17 21:19
  60:22
think
  10:2,3 15:25
  26:17 30:1
  31:24 34:21
  36:9 42:23

43:10 56:6,
  7,13 59:22
  67:14
thinner
  35:4,5
third
  10:17
thought
  49:9
three
  11:14 13:19
  17:22 18:2,3
  43:10 63:22
  64:8,15
three-
quarters
  34:24
tied
  29:10
time
  5:18 16:5
  23:9 27:3,4,
  12 39:11
  41:11 42:9,
  10,17,25
  43:4 44:1,22
  49:18 54:10
  57:4 61:20
  64:16 66:17
times
  13:18 63:14
  65:8,12,14
title
  24:25
today
  13:19 66:3
top
  45:24
totality
  29:8
touch
  49:2
touching
  60:16
traction
  12:15 21:21
  41:22 56:22

tractive
  41:16
traffic
  26:8 30:12
  31:17,23
  32:21
transfer
  22:15
tread
  63:3
trip
  5:8 8:23
  13:23
true
  37:12 67:11
trust
  8:13
truth
  4:3,4
try
  25:23
trying
  20:6 39:3
  60:18
two
  22:1 26:17,
  23 34:19,22
  35:2 39:17
  40:10 43:6
  55:14,16
  63:22
two-edged
  41:23
two-hour
  43:5
two-page
  30:2,24
two-sided
  30:2
type
  4:19 25:5,
  14,24 27:8
  63:2,3
types
  17:22 20:8,
  11,23

typically
  11:11 13:3
  62:3,4 64:5

——————

U

uh-huh
  11:9 34:20
  59:2
undergraduate
  57:8
understand
  20:5,7 48:10
  55:16 64:25
understanding
  13:13 16:4
  36:6 39:17
  46:17 54:9
underwater
  7:14
unduly
  28:25
uniform
  44:21
uniformly
  56:23 58:2
  59:11,13,23
United
  8:15
unpainted
  24:9,17,21
user
  24:1
user-related
  24:1
utilize
  29:14 51:16
utilized
  51:14

——————

V

value
  61:24
values
  51:20

variances
  23:25
variation
  56:22 61:2
varies
  5:16 8:25
various
  20:15 66:18
vary
  9:1 55:15
vehicles
  35:10
vehicular
  26:7
venue
  8:19
Verlaan
  4:6,13 66:9
versus
  6:17 7:2,11,
  23 8:9,15
  12:14 24:20
  51:15 61:3
  62:18
video
  17:6,14
  18:23,24
  20:16,18,22,
  24 22:1,2,5,
  18,19,24
  23:2 27:24
  28:1,14,16
  43:1,2,5
  47:13,18,19
  50:13 52:7
  61:15 68:3,9
view
  35:1,3
viewer
  50:20
viewing
  50:24
violations
  57:22
visible
  44:1

## W

waive
68:12,19
Wal-mart
13:12,13,25
14:1,4 17:5
36:13,20
37:24 39:9
41:18 54:17
58:1 61:12
63:8 66:14
67:4
Wal-mart's
40:4
Waldorf
6:17,23
walk
12:4,5
18:18,19
31:11 43:25
46:6,10
58:24
walked
21:5 28:5
44:16,17
63:17 68:3,
5,10
walking
11:8,11,12,
21,23 19:12,
14,15,20,22
20:4,15,22
22:14 24:24
25:21 31:19
35:12,16
46:5,10
51:17 53:22
56:23 57:2
58:2 63:7
66:11 67:23
walks
46:12 68:1
want
27:1,10
28:10 32:6

58:10
warning
31:15
watched
42:25 43:2
watching
28:14
water
5:4 8:3
22:2,6,20
45:24
way
11:22 26:23
27:7 32:2
35:6 36:18
42:5 46:9,12
47:3 58:12
60:2 63:12
ways
40:10
wear
27:11
wearing
12:13
weather
26:7 42:17
weathering
53:7,9
week
15:25
went
7:8 40:12
46:15
wet
22:2 31:2,7,
11 63:14,17
65:6
white
17:5 28:21
32:25 53:21,
23
whoever's
11:11
wide
33:9,13,20,
23,24

width
34:17,24
widths
34:7
wife
68:1
Williams
29:24 30:8
witness
4:5 9:17,20
12:22 16:18
19:17 20:1
26:5,22
27:7,22
29:3,19
30:19 31:4,
13 32:9
35:22 36:1,
15 37:3,8,15
38:3,11,20,
25 39:7,24
40:7,15,21
41:22 43:19
44:6,12,20
46:3,25
47:11 48:10,
19 49:21
52:22 53:7,
19 54:4,21
55:2,8,21
56:19 57:17
58:23 60:5,
12,25 64:25
67:14 68:7,
13,19
witnesses
17:16
work
4:24 9:9,12
10:19,21,22
13:14 16:10,
13 29:17
34:6,7,9,12
66:2
worked
13:16,17
14:2,3 16:12

Working
6:9
worn
39:11 62:22
63:8
wrong
17:8,12,15
58:16 66:14
67:3,4

## Y

Yeah
9:23 10:10
11:7 14:12
15:11 18:3,9
20:25 22:11
24:6,13,23
25:13 28:10,
16 30:19,23
49:11 50:9,
20 51:7 54:4
56:13 57:7,
17 60:25
64:25
year
5:16 6:17
9:1,2 13:6
26:17
years
26:17,23
36:10 39:17
55:14 64:19
yesterday
14:6

## Z

Z-D-E-N-E-K
16:19
Zdenek
16:19
Zed
16:18
Zimmerman
14:22 15:10,
12 34:21

46:15 47:4,
  17 57:17
  66:21
Zimmerman's
  14:23 15:22
  30:15 41:8
  42:10 55:18
  56:11,13,15
  57:15
zone
  30:12